James K. BALE and B.A. Guilfoil,
Movants,

v.

MAMMOTH CAVE PRODUCTION
CREDIT ASSOCIATION,
Respondent.

Supreme Court of Kentucky.

June 15, 1983.

Robert B. Hensley, Hensley, Talley &
Dunn, Horse Cave, Robert M. Alexander,
Glasgow, for movants.

Charles E. English and Kurt W. Maier,
English, Lucas, Priest & Owsley, Bowling
Green, for respondent.

OPINION OF THE COURT

After consideration of oral arguments
and briefs, the opinion of the Court of Ap-
peals by Judge Gudgel, as set forth below,
is hereby adopted as the opinion of this
court.

"This appeal stems from an action to
enforce two promissory notes. Appellant,
Mammoth Cave Production Credit Associa-
tion (PCA), asks us to determine whether
appellees, James K. Bale and B.A. Guilfoil
(Bale and Guilfoil), had any valid affirma-
tive defense to the enforcement of the
notes, and whether instruction # 3 given
by the trial court was erroneous. On cross-
appeal Bale and Guilfoil ask that we deter-
mine whether the court erred in dismissing
their counterclaim. Our task is difficult in

view of the voluminous record, and the numerous legal issues raised by able and experienced counsel. We have concluded that Bale and Guilfoil had no valid affirmative defense to enforcement of the notes. We have also concluded that the court did not err in dismissing Bale and Guilfoil's counterclaim. Accordingly, we reverse on the direct appeal and affirm on the cross-appeal.

Bale and Guilfoil's pleadings raised many diverse issues, most of which were resolved at the conclusion of an eight day jury trial. The court submitted three instructions to the jury. The first directed the jury to find for PCA unless they found for Bale and Guilfoil under instructions # 2 or # 3. These latter instructions dealt with affirmative defenses. Instruction # 2 dealt with the defense of fraudulent inducement. Instruction # 3 stated as follows:

> If the jury finds for P.C.A. under Instruction # 2, and you the jury believe from the evidence that during the period of time from the date of the execution of the note dated November 4, 1974, Exhibit # 1 in evidence, until Burnside was adjudicated to be bankrupt in July, 1976, P.C.A. by and through its officers and agents, expressly agreed with Guilfoil and Bale, or by its actions with respect to the transaction between Burnside and Guilfoil and Bale, and P.C.A.'s actions in dealing with Burnside's transactions with P.C.A., that same would be reasonably calculated to lead Guilfoil and Bale to believe, and Guilfoil and Bale did so believe, that P.C.A. would join with Guilfoil and Bale, and take and pursue against Burnside whatever action, legal or otherwise, would be necessary to protect the interest of both P.C.A. and Guilfoil and Bale on a pro rata basis; and that Guilfoil and Bale reasonably relied thereon, and took no independant [sic] action to protect their own interest which resulted to their detriment and loss, and benefit and gain to P.C.A. If you so believe from the evidence, the law is for defendants, Bale and Guilfoil, and you should so find but, unless you so believe you should find for plaintiff.

The jury returned a verdict for Bale and Guilfoil "under Instruction 3 only." PCA appeals from the judgment entered on the verdict. Bale and Guilfoil cross-appeal from the portion of the judgment which dismissed their counterclaim.

First, we note that we need not consider whether instruction # 2 was justified or whether the form of the instruction was proper because PCA does not raise any issue as to whether the instruction should have been given. Moreover, Bale and Guilfoil raise no issue about the instruction on cross-appeal. However, in order to dispose of the issues raised, we must refer to some of the factual matters included in the instruction.

## THE DIRECT APPEAL

PCA contends that even if it engaged in the conduct set forth in instruction # 3, such conduct did not afford Bale and Guilfoil an affirmative defense to enforcement of the promissory notes. Alternatively, PCA argues that if proof of the conduct set forth in instruction # 3 is an affirmative defense to the enforcement of a promissory note, Bale and Guilfoil were precluded from asserting the defense by the doctrine of res judicata. Moreover, PCA contends that instruction # 3 was erroneously drafted. We have concluded that even if PCA engaged in the conduct set forth in instruction # 3 that conduct did not afford Bale and Guilfoil an affirmative defense to the enforcement of the notes.

Instruction # 3 deals with a period of time from the date Bale and Guilfoil executed notes in favor of PCA. Specifically, it deals with a period between November 4, 1974 and July 1976. During this period both PCA and Bale and Guilfoil engaged in business transactions with one Ben Burnside, a wheeler dealer who was heavily involved in breeding and raising simmental cattle. PCA's involvement stemmed from substantial loans made to Burnside, while Bale and Guilfoil's involvement stemmed from a contract with him whereby they agreed to purchase 154 one-half simmental

cattle and he in turn agreed to purchase, at a fixed price, the first 75 three-quarter simmental cattle produced from the herd. Bale and Guilfoil executed notes and borrowed the funds for the transaction from PCA on November 4, 1974.

Bale and Guilfoil were dissatisfied with the cattle purchased from Burnside almost immediately because they were in poor condition and Burnside failed to provide appropriate registration papers. However, they made no attempt to pursue any legal remedy. By September 1975, Burnside had failed to comply with his duty to buy back the first 75 three-quarter simmental cattle produced by the herd. In addition, PCA learned that Burnside was also defaulting on cattle maintenance contracts he had with farmers in the area including Guilfoil. A meeting was held on September 9. Present were PCA's president, its attorney, Guilfoil, and another farmer. A written memoranda of the meeting reflects that it was agreed that plans should be made for litigation consisting of a joint action by PCA, Bale and Guilfoil against Burnside with, if possible, attachments to be issued against his unencumbered property to anticipate deficits. The memoranda also stated that the three parties would share on a pro-rata basis in any attachment liens.

Allegedly in reliance on the discussion at the meeting, Bale and Guilfoil did not employ counsel or attempt in any way to proceed independently against Burnside. No attachments were ever issued and in fact, Burnside had no unencumbered assets which could be attached. However, PCA's counsel did file a suit and collect $46,000 Burnside owed Guilfoil on a cattle maintenance contract. In early October 1975, PCA demanded that Burnside pay the indebtedness he owed it in full ($861,000 as of October 26, 1974). An employee of PCA went to Louisiana to discuss the matter with Burnside. Burnside advised him that he preferred litigating with Bale and Guilfoil. PCA's employee did not tell Bale and Guilfoil what he learned at the meeting on his return, or inform them he confirmed that Burnside was in serious financial trouble.

In November 1975, Burnside entered another contract with Bale and Guilfoil whereby he agreed to purchase 150 cows from them for a sum equal to the amount they owed PCA. The PCA employee who met with Burnside helped negotiate the deal. In February 1976, Bale and Guilfoil shipped the first 51 cows Burnside had agreed to purchase. Unfortunately, he did not pay for them and by July 1976 he had filed a Chapter 11 bankruptcy proceeding in Louisiana. PCA's counsel represented Bale and Guilfoil at the first meeting of creditors and was able to convince the court to treat them as unsecured creditors. They eventually collected $35,921.21 in the proceeding.

PCA, on the other hand, was treated as a secured creditor because it had recorded a second mortgage on Burnside's plantation in Louisiana on March 21, 1975. As a result, PCA was able to collect almost all of the indebtedness Burnside owed it. The mortgage had been recorded more than one year prior to his bankruptcy and thus could not be set aside or voided as a preferential transfer under the bankruptcy act or Louisiana law. PCA never disclosed to Bale and Guilfoil prior to the bankruptcy that its indebtedness was secured by a mortgage.

In instruction # 3 the court directed the jury in substance that if they believed that between November 4, 1974 and July 1976 PCA expressly agreed, or by its conduct led Bale and Guilfoil to believe, that it would join with Bale and Guilfoil and pursue against Burnside whatever action was necessary on a pro-rata basis, and Bale and Guilfoil relied on this agreement and took no independent action to protect their own interest which resulted in a loss and detriment to them and a benefit and gain to PCA, then the law of the case was for Bale and Guilfoil and they should so find. The instruction was in conformity with Bale and Guilfoil's theory that PCA breached a fiduciary duty it owed them, the violation of which was a complete defense to PCA's suit to enforce payment of their notes.

Specifically, Bale and Guilfoil alleged that PCA breached its fiduciary duty in two

ways. First, they claimed PCA misrepresented Burnside's financial affairs and failed to disclose what it knew about his affairs. Second, they claimed PCA engaged in a course of conduct after the loan was made to convince them that their interest was being protected when in fact PCA was not protecting their interest, but rather, was inducing them to refrain from taking independent action in order to delay the date of Burnside's bankruptcy until its second mortgage was no longer in jeopardy of being set aside as a preferential transfer. This conduct, they argue, afforded them an affirmative defense to PCA's action to enforce their notes. We disagree.

Two cases are cited as the major support for Bale and Guilfoil's contention, *Henkin, Inc. v. Berea Bank & Trust Co.*, Ky.App., 566 S.W.2d 420 (1978) and *First National Bank in Lenox v. Brown*, 181 N.W.2d 178 (Iowa 1970). While we do not disagree with the decision in either of these cases, we do not agree that they are authority for Bale and Guilfoil's theory in this case.

In *Henkin, supra*, the maker of a promissory note alleged that it had a contract with the payee to pay the note off at a discount. The maker applied for a loan from the bank in order to pay off the loan and avail itself of the discount. In making the application, the maker revealed the potential discount to a bank officer. The loan application was denied. Subsequently, the bank, through an agent, induced the payee to breach the contract and proceeded to interfere with the maker's prospective advantage by purchasing the note itself, thus availing itself of the discount. The maker claimed that the bank's conduct had perpetrated a fraud on it and was a breach of a confidential or fiduciary relationship which arose between it and the bank at the time it had applied for a loan. In holding that the maker's counterclaim in an action to enforce the note stated a claim for relief this court reached two conclusions. First, we held that a bank can stand in a fiduciary capacity with respect to confidential relations with its customers, and that if it breaches the duty, it may be made to respond in damages. Second, we held that if a bank

interferes with a prospective advantage of its customer by purchasing a note of the customer at a discount, after denying a loan application of the customer to enable it to do the same thing, the bank may be found to be guilty of a breach of its fiduciary duty.

In our view *Henkin* does not support Bale and Guilfoil's theory in this case. First, *Henkin* does not stand for the proposition that a bank's breach of a fiduciary duty to its customer may serve as an affirmative defense to an action to enforce a promissory note owed by the customer to the bank. On the contrary, *Henkin* only recognizes that such a breach may afford the maker of the note a basis for asserting a counterclaim for damages in such an action. Second, the only prospective advantage Bale and Guilfoil had which PCA could have interfered with, was whatever advantage they might have gained by filing an action against Burnside prior to his bankruptcy, or by successfully contesting PCA's status as a secured creditor in that proceeding. There is no evidence as to whether Bale and Guilfoil could have successfully prosecuted an action and recovered the amount they owed PCA prior to Burnside filing for bankruptcy. It is also clear that the sums Bale and Guilfoil might have gained by successfully getting PCA treated as an unsecured creditor in the bankruptcy did not equal or exceed the amount Bale and Guilfoil owed PCA. Therefore, *Henkin* is not authority for the proposition that PCA's conduct, if true, was a complete defense to PCA's action to enforce the notes. On the contrary, PCA's efforts, if any, to delay Burnside's bankruptcy only afforded Bale and Guilfoil a basis for asserting a counterclaim for damages, not an affirmative defense to PCA's action to enforce the notes.

The other case relied upon by Bale and Guilfoil, *First National Bank, supra*, is clearly distinguishable. In that case, the bank made a loan to a customer to enable him to purchase an interest in the assets of a service station. At the time the bank held a security interest in the assets being acquired, and made the loan in order to

protect itself against potential losses on loans previously made to the seller of the assets. However, the bank failed to disclose its pecuniary interest in the transaction, and misrepresented the seller's true financial posture. The court affirmed a judgment in favor of the bank's customer on the basis that he had been fraudulently induced to make the loan.

The distinguishing factors between this case and *First National Bank, supra,* are obvious. First, the latter case is a fraudulent inducement case. In the case at bar, there was no fraudulent inducement in connection with Bale and Guilfoil's loan from PCA as the jury specifically found that they were not fraudulently induced to execute notes. Second, in *First National Bank,* the bank's fraudulent conduct occurred before its customer took a loan. In the case at bar, most of the alleged fraudulent conduct occurred after the loan was made. More importantly, the alleged fraudulent conduct in *First National Bank* dealt directly with the loan transaction the customer sought to avoid. In this case, the alleged fraudulent conduct only indirectly dealt with the loan transaction, dealing principally instead with a period subsequent to the making of the loan during which Bale and Guilfoil were allegedly prevented from adequately protecting their rights against Burnside. Therefore, in our view *First National Bank, supra,* like *Henkin, supra,* is not authority which supports the defense Bale and Guilfoil relied on in this action.

In defending this action, Bale and Guilfoil and their counsel skillfully clouded the issues by concentrating on PCA's involvement in their transactions with Burnside. They did this by making numerous allegations pointing to PCA as being solely responsible for their present predicament, and were successful in convincing a jury to shift the loss to PCA. We are of the opinion that the court erred in permitting them to do so.

There is little evidence whatever that PCA had anything to do with Bale and Guilfoil's initial involvement with Burnside. In fact, Guilfoil was involved with Burnside before he and Bale ever applied for the November 4, 1974 loan. It was on their own initiative that Bale and Guilfoil approached PCA to secure a loan in order to get into the cattle business with Burnside. True, there was evidence that at the time the loan was made PCA may have made fraudulent representations as to Burnside's financial position and his ability to comply with his contractual duty to buy back cattle from them. However, these issues of fact were squarely submitted to the jury by the court's instruction # 2. The jury resolved these issues against Bale and Guilfoil, finding that PCA was not guilty of any fraudulent conduct in connection with the loan transaction itself. Thus, PCA was entitled to enforce Bale and Guilfoil's notes unless its alleged additional fraudulent conduct subsequent to the loan, which was embodied in the court's instruction # 3, somehow afforded them an affirmative defense to their enforcement. As discussed previously, while this conduct may have afforded Bale and Guilfoil a basis for asserting a counterclaim for damages, it did not afford them a basis for defeating PCA's right to enforce their notes. In short, we are of the opinion that alleged fraudulent conduct of a bank or lender, such as that set forth in the trial court's instruction # 3, does not as a matter of law preclude a lender from enforcing promissory notes executed prior to the time such conduct occurs. It follows, therefore, that the judgment in favor of Bale and Guilfoil must be reversed.

## THE CROSS–APPEAL

The trial court directed a verdict for PCA on Bale and Guilfoil's counterclaim on the basis that they had failed to prove damages. Assuming for purposes of argument, that PCA was in a fiduciary position vis a vis Bale and Guilfoil from November 4, 1974 forward, and breached that duty so as to be liable for damages on a counterclaim, Bale and Guilfoil had the burden of proving the damages they incurred. The court concluded that they failed to meet their burden and directed a verdict for

PCA. We agree with the trial court's ruling.

At the outset we note again that the jury found there was no fraud in connection with the period of time prior to November 4, 1974. Therefore, we will limit our consideration of Bale and Guilfoil's cross-appeal to the issue of whether there was any proof of damages attributable to the claimed fraudulent conduct of PCA subsequent to that date. In this connection, Bale and Guilfoil argue that PCA owed them a fiduciary duty during the period and breached it by failing to take action against Burnside to protect their interest as agreed and by deliberately engaging in a course of conduct designed to prevent them from taking any action to protect their interest until PCA's status as a secured creditor of Burnside was perfected. Assuming their contention is correct, the only items of damages that we perceive were recoverable are: (1) any amounts they could show they would have recovered by filing an independent action against Burnside prior to his bankruptcy and (2) any additional amounts they would have recovered in the bankruptcy had PCA been treated as an unsecured creditor. That Bale and Guilfoil could have proved the first item of damages is extremely doubtful because such proof would have necessarily been based in large part on pure speculation. In any event, there was no effort made to introduce such proof. The second item of damages, while capable of proof, simply was not proved by Bale and Guilfoil, since there is no evidence whatever as to what additional amounts they would have recovered in the bankruptcy had PCA been adjudged to be an unsecured creditor. Accordingly, we hold that the court did not err in directing a verdict on Bale and Guilfoil's counterclaim.

In light of our conclusions to this point in the opinion, the parties' remaining contentions are moot.

For the reasons stated, so much of the judgment as dismisses Bale and Guilfoil's counterclaim is affirmed; the remainder is reversed and remanded with directions to enter a new judgment in favor of PCA awarding it the unpaid balance due on Bale and Guilfoil's promissory notes together with interest and costs.

ALL CONCUR."

The opinion of the Court of Appeals is affirmed.

All concur, except VANCE, J., not sitting.