Arie DE JONG, Jr., Appellant,

v.

LEITCHFIELD DEPOSIT BANK; Max Alton Vincent; Kevin L. Brooks; Melissa E. Brooks; Lakeview Golf Club, Inc.; Danny Lee Cohagen, Individually; Dwight D. Embry, Individually; and Sammy Kaye Tilford, Individually, Appellees.

and

Charles Marty Higdon, Appellant,

v.

Leitchfield Deposit Bank; Max Alton Vincent; Kevin L. Brooks; Melissa E. Brooks; Lakeview Golf Club, Inc.; Danny Lee Cohagen, Individually; Dwight D. Embry, Individually; and Sammy Kaye Tilford, Individually, Appellees.

Nos. 2006–CA–000744–MR,
2006–CA–000746–MR.

Court of Appeals of Kentucky.

Nov. 21, 2007.

Rehearing Denied May 7, 2008.

Dwight Preston, Elizabethtown, KY, for appellants.

David B. Vickery, Leitchfield, KY, for appellee Leitchfield Deposit Bank.

Before HOWARD and STUMBO, Judges; BUCKINGHAM,[1] Senior Judge.

*OPINION*

HOWARD, Judge.

These appeals are from a summary judgment granted by the Grayson Circuit Court, in favor of the Appellee, Leitchfield Deposit Bank (hereinafter the bank), enforcing personal guaranty agreements executed by the Appellants, Arie de Jong, Jr. (hereinafter de Jong) and Charles Marty Higdon (hereinafter Higdon), securing a loan made by the bank to the Appellee, Lakeview Golf Club, Inc. (hereinafter Lakeview). The appellants contend that the circuit court erred in granting summary judgment because genuine issues of material fact exist and because the bank breached a fiduciary duty of disclosure; was guilty of misrepresentation in inducing them to enter into the transaction; breached an implied covenant of good faith and fair dealing; breached other duties owed to them; and that the circuit court erred in determining the amount of damages. Finding no error, we affirm.

---

1. Senior Judge David Buckingham sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

Lakeview was incorporated on August 5, 1999, for the purpose of purchasing and operating a golf course. Its original shareholders included the appellants, de Jong and Higdon, as well as Danny Lee Cohagen, Dwight D. Embry, Sammy Kaye Tilford, Max Alton Vincent, and Kevin and Melissa Brooks. Each shareholder contributed $50,000 at Lakeview's startup, and Tilford invested an additional $50,000 for a total of $100,000. In December 1999, Sammy and Martha Tilford, who were the previous owners of the golf course, sold their interest to Hansen Enterprises, Inc., and Hansen Enterprises thereafter assigned its rights to Lakeview.

Lakeview borrowed $1.1 million from the bank at its origination in December 1999. As security for the loan, Lakeview executed a promissory note, a mortgage on its real property, and a security interest in its personal property. Additionally, Tilford executed a personal guaranty agreement in favor of the bank for up to $276,000; de Jong, Higdon, Vincent, Cohagen, Embry and the Brookses each executed separate personal guaranty agreements for up to $138,000 each.

The appellants allegedly were told by other shareholders that the golf course was worth $2 million, despite an existing appraisal of approximately $1.5 million. They also allege that they were only told of $944,832 in previously existing indebtedness, when the true amount of debt exceeded $1.5 million.

Prior to the loan closing, de Jong met several times with Terry Bunnell, a bank officer, and inquired about the prospects of the golf course being successful and various changes which might be necessary to increase the likelihood of its making a profit. Bunnell told de Jong that the bank would "scrutinize" any expenses of Lakeview exceeding $20,000. Significantly, de Jong does not allege that he relied on any other statements or representations made by Bunnell or the bank.

At its inception Lakeview assumed indebtedness of the previous owners of $1,506,697.00, as found by the circuit court. Lakeview paid off various of these debts soon after the December 1999 loan closing. One was an unsecured note owed by Hansen Enterprises to the bank in the sum of $215,189.41. Lakeview authorized payment of the Hansen Enterprises note, even though no evidence exists that Lakeview was obligated to pay this note. The circuit court ultimately made a finding that it was not so obligated. The appellants allege that the bank pressured Lakeview to pay this debt, but there is no evidence in the record to support this assertion.

In August 2001, Lakeview borrowed an additional $45,994.18 from the bank, which loan was secured by the December 1999 mortgage, security agreement, and guaranty agreements. Lakeview subsequently defaulted on its loans from the bank. In September 2002, the bank filed a foreclosure action against Lakeview and its individual shareholders and sought judgment on the personal guaranty agreements. De Jong and Higdon filed cross-claims against their co-defendants for contribution and indemnity and also asserted counterclaims against the bank. The Brookses, Embry, Vincent and Tilford each paid their guaranties and promissory notes in favor of the bank. Cohagen filed for bankruptcy protection after a summary judgment was entered against him.

On January 15, 2003, Lakeview's property was sold to the bank for $600,000. The bank thereafter sold the property for $650,000 and credited $50,000 to Lakeview's debts. By summary judgment entered on October 14, 2005, the circuit court granted the bank a judgment against de Jong and Higdon and dismissed their counterclaims against the bank. Their

claims against the other shareholders remain pending. The circuit court denied the appellants' motions to alter, amend, or vacate the summary judgment. On January 31, 2006, the circuit court entered its order, made final pursuant to CR 52.04, determining the amount of damages owed by each appellant. De Jong and Higdon each filed a notice of appeal.

Our role in reviewing a summary judgment is to determine whether the circuit court correctly found that no genuine issue exists as to any material fact and that the bank is entitled to judgment as a matter of law. *Scifres v. Kraft*, 916 S.W.2d 779 (Ky. App.1996). A summary judgment is reviewed de novo because factual findings are not at issue. *Pinkston v. Audubon Area Community Services, Inc.*, 210 S.W.3d 188 (Ky.App.2006), *citing Blevins v. Moran*, 12 S.W.3d 698 (Ky.App.2000).

Summary judgment is appropriate, "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. The movants must demonstrate that the adverse parties cannot prevail under any circumstances. *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255 (Ky.1985). "The proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d at 480 (Ky.1991). " '[I]mpossible' is used in a practical sense, not in an absolute sense." *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky.1992).

However, "the party opposing summary judgment 'cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *O'Bryan v. Cave*, 202 S.W.3d 585, 587 (Ky.2006), *quoting Steelvest, supra*, 807 S.W.2d at 481 (citations omitted). Similarly, this court has stated that a party opposing a motion for summary judgment must present "some affirmative evidence showing that there is a genuine issue of material fact for trial." *Hallahan v. The Courier Journal*, 138 S.W.3d 699, 705 (Ky.App.2004), *quoting Steelvest* at 482. The trial court's focus should be on what is of record rather than what might be presented at trial. *Welch v. American Publishing Co. of Kentucky*, 3 S.W.3d 724 (Ky.1999).

■ De Jong and Higdon first contend that the trial court erred in failing to separate their claims. However, they fail to demonstrate how they were prejudiced by such procedure. With the exception of arguments relating to de Jong's conversations with the bank officer prior to the loan closing, both appellants raise similar issues. It is clear from the circuit court's orders that it differentiated between de Jong and Higdon, when such differentiation was appropriate. We find no error in the circuit court's considering the appellants' arguments together, and we will do the same.

■ De Jong contends that he had more than the typical debtor-creditor relationship with the bank and that the bank owed him a fiduciary duty of disclosure, which it breached by not revealing to him that Lakeview was a "disaster waiting to happen." A fiduciary duty may exist in a variety of contexts and is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's bene-

fit in matters connected with such undertaking." *Steelvest,* 807 S.W.2d at 485. De Jong emphasizes the following language from *Steelvest:*

> Courts traditionally view a relationship between a bank and a depositor to be one of debtor-creditor and do not ordinarily impose a fiduciary duty of disclosure upon the bank. However, services to borrowers and pledgors may support a finding that a bank, in taking a borrower's note and collateral, falls under a fiduciary duty to disclose material facts affecting the loan transaction. In view of changes in the nature of commercial transactions bankers may sometimes be placed in a position of trust with respect to their customer. *Henkin, Inc. v. Berea Bank and Trust Co.,* Ky.App., 566 S.W.2d 420 (1978).

*Steelvest,* 807 S.W.2d at 485.

*Henkin* is instructive, in that it demonstrates the type of situation in which a fiduciary duty will be found to exist. In that case, the maker of a promissory note contracted with the payee to pay the note off at a discount, then applied for a loan at the bank for that purpose. In doing so, they revealed the potential discount to the bank. The bank denied the loan, then allegedly induced the payee to break the contract with the maker and purchased the note itself, availing itself of the discount, but refusing, as the new holder of the note, to pass it on to the maker. *Henkin,* 566 S.W.2d at 422.

There are no such facts in the case at bar, and no evidence exists to support a finding that the bank owed de Jong a fiduciary duty. Although de Jong relies on his conversations with Mr. Bunnell, the bank officer, and Bunnell's statement that the bank would "scrutinize" expenses exceeding $20,000, de Jong's deposition testimony fails to provide any support for his argument that a confidential relationship existed. He contends that the bank breached its duty to him by failing to reveal that Lakeview's indebtedness exceeded the amount of the bank loan. But while de Jong's testimony about his conversations with the bank officer may show that he has a valid claim against his fellow shareholders, it fails to demonstrate any such claim against the bank:

Q. Did Mr. Bunnell make any other assurances to you as to things that the bank would do?

A. Um, I'm assuming you mean as far as scrutinization. (sic)

Q. As to anything?

A Um, none more than what I've indicated. I'll explain—we've had a little break so I'll explain one more time. I asked how it would be different and I was told we are going to scrutinize major expenditures.

Q. Um-hm.

A. So—and, in other words, the term he used was scrutinize expenditures, and I said, "What do you mean by that?" and he said, "Well, anything that other than daily operational money, like the light bill and the fuel bill for the mowers and—we understand all that. But if they want to make any major changes and use any major portions of the money then they are going to have to talk to us first. And we would have—we would study it and see if, um, it's a feasible thing to do, and if it's the right thing to do."

. . . .

Q. When we talk about that money are we talking about the loan money that the Leitchfield Deposit Bank loaned out, the $1.1 million, or are we talking about revenues coming in to the golf course, what are we talking about?

A. Well, um, when you use the term 1 point—the amount $1.1 million, uh, that's

what we borrowed, but I never—I never—I was never under the assumption that there was any cash involved, other than—other than the $50,000 eight people were putting up, . . . And of that money a good portion of that was going to be operational money. *I asked if there were any other debts that, um, that we owed, or that they owed, I should say, because I owed none, other than $50, 000 I was going to invest in it. And the way it was answered was there are some outstanding debts.*

So I went back to Vincent and Brooks, who seemed to be—who seemed to know more about that particular golf course than anyone else I talked to, and I said the bank tells me that there might be some more debts, what are they? And Vincent—both of them—told me it would be no more than $15,000. And those are—I think they had missed a cart payment and something else, I don't remember what. But—but when I heard the number 15,000, that's minute compared to the 400, uh, thousand dollars were were going to put into it, so it didn't concern me. It was just, uh, so we'll pay that and move on.

So when—when I went back with that in mind, even, foreclosure, the impression I was under is that most of that money, most of the $400,000, was going to be used for operational purposes. In other words—

. . . .

Q. Do you know what happened to the 1.1 million that was borrowed?

A. I have no idea.

Q. Did you ever ask?

A. I asked. Um, it's—it's much like—and this is the only example I can use, that the meeting that I remember best they talked about paying off some kind of loans, and I said so there's loans. And of course so did Mr. Higdon, and I believe Tilford mentioned—said—asked some questions there. And they said yeah. And I said so in order to pay off these loans are we making enough profit to start doing things like this? And they said, uh, oh, yes, the golf course is making money now.

Q. Now wait a minute. Let me interrupt you there.

A. Um-hm.

Q. You're talking—you're talking to your fellow stockholders now—

A. Right.

Q. —is that correct?

A. Right. At a stock—

Q. This is not the bank talking?

A. No.

(Emphasis added.)

Applying Kentucky law, the Sixth Circuit Court of Appeals stated the following in *Sallee v. Fort Knox Nat'l Bank, N.A.,* 286 F.3d 878, 893 (6th Cir.2002):

[B]anks do not generally have fiduciary relationships with their debtors. This flows from the nature of the creditor-debtor relationship. As a matter of business, banks seek to maximize their earnings by charging interest rates or fees as high as the market will allow. Banks seek as much security for their loans as they can obtain. In contrast, debtors hope to pay the lowest possible interest rate and fee charges and give as little security as possible. Without a great deal more, a mere confidence that a bank will act fairly does not create a fiduciary relationship obligating the bank to act in the borrower's interest ahead of its own interest. . . .

Kentucky courts have twice imposed a fiduciary duty in the relationship between a bank and a borrower. On both occasions, the bank profited at the borrower's expense from confidential information received from the borrower.

The Sixth Circuit in *Sallee* went on to discuss *Steelvest* and *Henkin* as the only two such cases in Kentucky.

De Jong did not allege that the bank profited from any confidence gained from him. He failed to produce any evidence that his relationship with the bank was other than a typical debtor-creditor relationship, or that the bank owed him a fiduciary duty of disclosure. No genuine issue of material fact exists as to this issue.

█ De Jong and Higdon also contend that their claims are supported by *Bale v. Mammoth Cave Production Credit Ass'n*, 652 S.W.2d 851 (Ky.1983), and an Iowa case cited therein, *First National Bank in Lenox v. Brown*, 181 N.W.2d 178 (Iowa 1970). The facts in *Brown*, which the appellants claim are similar to those in this case, were set out in *Bale*, as follows:

> [T]he bank made a loan to a customer to enable him to purchase an interest in the assets of a service station. At the time the bank held a security interest in the assets being acquired, and made the loan in order to protect itself against potential losses on loans previously made to the seller of the assets. However, the bank failed to disclose its pecuniary interest in the transaction, and misrepresented the seller's true financial posture. The court affirmed a judgment in favor of the bank's customer on the basis that he had been fraudulently induced to make the loan.

*Bale*, 652 S.W.2d at 854–855.

The Kentucky Supreme Court in *Bale* recognized the cause of action set out in *Brown*, fraudulent inducement to enter into a loan, but distinguished that case because in *Bale* the alleged fraud occurred after the execution of the loan, not before. Here, the appellants appear to have stated a cause of action for fraud in the inducement, but failed to offer any evidence to support that cause of action, in response to the motion for summary judgment. No evidence exists in the record that the bank participated in bringing Lakeview to de Jong's and Higdon's attention, encouraged them to enter into the transaction, or took any other action, relative to de Jong or Higdon, to advance the bank's own interests. The appellants suggest that the bank promoted this transaction to improve its posture relative to the $215,000 unsecured debt owed to the bank by Hansen Enterprises, which they characterize as a "bad debt." But there is no evidence of record to show that this was a bad debt, or that the bank was behind either the incorporation of Lakeview, the sale of the assets, or the recruitment of investors such as de Jong and Higdon.

Neither is there any evidence of record that the bank misrepresented or failed to disclose any material fact. The bank officer informed de Jong that Lakeview had debts in addition to those listed on the loan documents. With this information, de Jong questioned other shareholders and was allegedly misinformed *by them* as to the amount of the debts. No evidence exists that the bank impeded the appellants' investigation of Lakeview's financial status. Higdon did not talk with bank officers prior to the loan closing and admitted that the bank had no knowledge that the Lakeview shareholders did not inform him of the extent of Lakeview's debts.

█ Both de Jong and Higdon contend that the bank breached an implied covenant of good faith and fair dealing before and during its foreclosure action. "Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank and Trust Co. of Georgetown, Kentucky v.*

*Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky.2005), *citing Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154 (Ky.1991). The appellants contend that the bank went "to the shareholder meeting and demand[ed] that the shareholder's (sic) deed the property back that day and not give them time [which] was an act of overbearance [and] arrogance...." But the record does not support the appellant's characterization of the January 2003 shareholder meeting. De Jong was not present at that meeting. Higdon was present, but he testified only that the bank said that was the "last day" the offer would be available,[2] and if it was not accepted, the property would be sold at the courthouse. Likewise, Lakeview's corporate minutes reflect only that officers of the bank attended that meeting and indicated that the offer needed to be accepted that day, or the property would be sold at the courthouse steps, but do not indicate any "overbearance." Those minutes also indicate that after considerable discussion, the shareholders voted to accept the offer, with only Higdon voting "no."

 The appellants also object to the bank's valuing Lakeview at $600,000 when it was assigned to the bank. The record shows that, prior to the bank's obtaining Lakeview's assets, the shareholders were unsuccessful in their attempts to sell the golf course, and there is no evidence of record that Lakeview was worth more than $600,000 in January of 2003. Although the appellants claim that they retained an expert for trial to testify to the bank's transgression of the implied covenant of good faith and fair dealing, no affidavit of his purported testimony was produced to respond to the bank's summary judgment motion. "An implied covenant of good faith and fair dealing does not prevent a party from exercising its con-

tractual rights." *Willmott Hardwoods*, 171 S.W.3d at 11.

 De Jong and Higdon complain that the circuit court erred in determining the amounts each owed to the bank. In its January 21, 2006, order, the circuit court awarded the bank a judgment against the appellants of $223,388.38, with judgment interest beginning January 10, 2006. De Jong and Higdon would each owe a minimum of $111,694.19, one-half of the judgment, and a maximum of $138,000, the amount of each personal guaranty agreement. They claim that they were entitled to credit for any debts that Lakeview paid that existed prior to its incorporation, and point to other expenditures allegedly inappropriately authorized by Lakeview or its shareholders. But the appellants fail to point to any evidence in the record that the bank participated in any of the expenditures they question. The appellants also point to the loan provision stating that "no investment in fixed assets in excess of $20,000.00 in any twelve month period will be made except upon consent of Bank first having been obtained," and Mr. Bunnell's oral assurance to de Jong that the bank would "scrutinize" any such expenditures. But the appellants offered no evidence that the bank failed to fulfill such obligation.

The appellants also contend that a statement by one of the bank's officers, a Mr. Allgood, that each owed $110,862.07 was a judicial admission that they owed no more than that sum. The appellants, however, overlook the fact that this amount was calculated as of the date the statement was made. The circuit court's January 21, 2006, order reflects very careful consideration in calculating the amount of damages. We find no error in this regard.

---

**2.** It is not clear how long this offer had been on the table before the meeting.

Finally, the appellants assert that the circuit court erred in crediting the amount of the January 2003 sale of Lakeview to the bank as $433,013.53, and not $600,000. This argument is without merit. The deed of conveyance from Lakeview to the bank specifically directed that taxes, an "indebtedness of [Lakeview] held in the name of Dwight Embry and Sammy Tilford owing to [the bank]" and "delinquent golf cart lease payments" be paid from the $600,000. The deed of conveyance was explicitly referenced in Lakeview's minutes.

At almost every point of contention on this appeal, the appellants have stated potentially valid causes of action, but at each point they have failed to produce any evidence, in the record, to support such legal theories. The bank met its *prima facie* burden of demonstrating the absence of any genuine issue of material fact. The appellants failed to produce any affirmative evidence, by deposition testimony, affidavits, documents or otherwise, to counter the bank's evidence, offered in support of its motion for summary judgment. Unsupported allegations are insufficient to create a genuine issue of material fact. *O'Bryan v. Cave, supra; Hallahan v. The Courier Journal, supra.*

The summary judgment entered by the Grayson Circuit Court is affirmed.

ALL CONCUR.