**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0366n.06

Case No. 15-5884

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jun 30, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ABDUL G. BURIDI, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| BRANCH BANKING AND TRUST | ) | KENTUCKY |
| COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SILER, COOK, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Plaintiff appeals the district court's grant of Defendant's motion for summary judgment in this diversity action, alleging fraud and breach of contractual duty. Plaintiff alleged that Defendant fraudulently and in bad faith induced him to enter into an agreement to personally guarantee a portion of a loan funding the construction of a new hospital. On appeal, Plaintiff contends that the district court erred in finding that no genuine issues of material fact existed. We **AFFIRM** the judgment of the district court.

I.

Plaintiff Dr. Abdul Buridi ("Buridi") is a physician, who also has experience in business and investing. In addition to his own medical practice, Buridi has been an investor or a

participant in a variety of businesses, including a medical billing company, a chain of urgent care centers, a physical therapy practice, a beauty salon, hotels, and various commercial real estate interests.

One of his investments was in Kentuckiana Medical Center, LLC ("KMC"),[1] a startup hospital located in Clarksville, Indiana. In early 2007, he purchased one share of Kentuckiana Investors, LLC ("KI"). Buridi's investment in the venture was approximately $34,400. A single share of KI constituted approximately 1% ownership interest and 0.5% indirect ownership interest in KMC. Before he invested, the leaders of the KMC project told him that the hospital was going to be a 60-bed facility and showed him cash flow projections based on a 60-bed facility. Buridi, however, never reviewed the construction bids or construction contract and testified that he only "glanced at" the KMC operating agreement, financial pro formas, and hospital plans prior to or after investing. The construction bids from as early as August 2006 indicated that KMC was considering "shelling" 12 patient rooms in the hospital's "E Wing"[2] to reduce construction costs.

In April 2007, three months after Buridi made his initial investment in the KMC project, BB&T issued a loan commitment letter agreeing to loan up to $21.5 million to KMC Real Estate Investors, LLC ("KMCRE"), the entity that owned the land where the KMC building was constructed. The letter stated that the loan would be used for "constructing a 60 bed acute care 80,000 sq. ft. single story hospital in Southern Indiana." R. 56-7, PageID 798. The letter further indicated that it did "not set forth all the terms and conditions of the loan offered herein. Rather,

---

[1] KMC is a joint venture between Kentuckiana Investors, LLC ("KI") and Cardiovascular Hospitals of America, LLC ("CHA"). Approximately 30 physicians became the owners of KI, and, in turn, became the owners of a 49% minority share of KMC. CHA, the other investor in KMC, became the owner of the remaining 51% of KMC. KMCRE is owned by KI, CHA, and certain individual investors. (R. 50, PageID 691–92.)

[2] This meant that KMC was considering only constructing the exterior walls and roof but not the interior walls.

it is only an outline, in summary format, of the major points of understanding which shall be the basis of the final loan documentation." R. 56-7, PageID 798. One of the "points of understanding" explained that several KMC investors, including Buridi, would execute personal guaranty agreements, securing the BB&T loan.

The construction loan from BB&T closed in June 2007. In July 2007, Buridi signed a guaranty agreement, agreeing to guarantee $430,000 of the $21.5 million loan. The guaranty agreement stated that KMCRE had been granted a loan from BB&T in the amount of $21.5 million and that BB&T's determination to grant loans and discounts to KMCRE was conditioned upon execution of the guaranty agreement. Under the agreement's terms, any failure by KMCRE to pay its debt would give BB&T the option to immediately enforce the guaranty against the guarantors.

Construction of the KMC hospital building commenced later in 2007. Instead of 60 beds, the hospital contained 34 operational, non-emergency beds. KMCRE also built a wing of its hospital, the "E-Wing," as a "shell" without beds and interior fixings.

Shortly after the hospital opened in August 2009, severe financial problems ensued due to revenue problems. Consequently, the hospital began to default on its obligations to creditors, including BB&T. From August 2009 to October 2009, KMC had only 10 beds staffed to accommodate patients, but, at any given time, only about five of its 10 beds were occupied. In December 2009, KMC staffed an additional eight beds, bringing its total beds to 18, and by the summer of 2010, had staffed all 34 of its licensed beds. However, KMC's utilization rate never exceeded 70% and, eventually, both KMC and KMCRE filed for bankruptcy. After KMCRE defaulted on its obligations under the construction loan, BB&T sold the loan to a distressed loan investor, which proceeded to enforce the guaranties, including the one provided by Buridi.

Buridi brought this suit maintaining that he was unaware of the hospital's plans to build the E-Wing as a shell and to make only 34 beds available for patients, which reduced its capacity to generate the revenue he believed necessary for KMCRE to repay its construction loan. He contends that BB&T knew of the hospital's plans to reduce its capacity prior to soliciting his guaranty. Had he known of the hospital's plans to reduce capacity, Buridi argues, he would have refrained from entering into the guaranty agreement.

Buridi's complaint included claims for fraud, negligent misrepresentation, and breach of duty of good faith and fair dealing against BB&T in connection with Buridi's guaranty. Pursuant to 28 U.S.C. § 1332, the district court reviewed the case, and, in March 2013, granted BB&T's motion to dismiss Buridi's fraud and negligent misrepresentation claims but allowed his good faith and fair dealing claim to proceed. The district court later granted Buridi leave to amend his complaint to add factual allegations to his good faith and fair dealing claim and to reassert his fraud claim. BB&T then filed a motion for summary judgment on Buridi's claims, which the district court granted after finding that Buridi failed to prove each element, particularly the element of reasonable reliance. Further, the district court found that Buridi failed to sufficiently prove that he was entitled to recover for breach of good faith and fair dealing. This timely appeal followed. 28 U.S.C. § 1291.

## II.

We review *de novo* a district court's grant of summary judgment. *Paterek v. Vill. of Armada*, 801 F.3d 630, 645 (6th Cir. 2015). We may affirm a grant of summary judgment only if the material facts are not in dispute and the moving party, in light of the facts presented, is entitled to judgment as a matter of law. *Gillie v. Law Office of Eric A. Jones, LLC*, 785 F.3d 1091, 1097 (6th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). The moving party bears the initial

burden of identifying the basis for its motion and the parts of the record that demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, the non-moving party must point to specific facts demonstrating a genuine issue of fact that should be decided by a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. *Id.* at 252.

### A.

Buridi first asserts that the district court erred in granting BB&T's motion for summary judgment on his fraudulent misrepresentation claim for failure to demonstrate that his reliance on the loan commitment letter was reasonable. The district court found that it was not reasonable for Buridi to exclusively rely on the limited representations made in BB&T's loan commitment letter that the loan would be used for "constructing a 60 bed acute care 80,000 sq. ft. single story hospital in Southern Indiana." R. 80, PageID 1754, 1758, 1761.

Under Kentucky law, which governs this action, the party asserting fraud has the burden of establishing, by clear and convincing evidence, the following six elements: (1) material misrepresentation; (2) which is false; (3) which was known to be false, or was made recklessly; (4) made with inducement to be acted upon; (5) which is acted upon in reliance thereon; and (6) causes injury. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993). Kentucky law recognizes a presumption of innocence and honesty against fraud claims. *Id.* (citation omitted).

To establish a fraud claim, a plaintiff's reliance upon a defendant's false representation must be reasonable or justifiable. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing Restatement (Second) of Torts § 537 (1977)). "[E]quity will grant no relief to a

complaining party who has means of knowledge of the truth or falsity of representations." *Moore*, 992 F.2d at 1447 (internal citations omitted).

The district court focused primarily on the fifth element of the fraud claim: Buridi's reasonable reliance upon the 60-bed term in the loan commitment letter. The district court assumed for purposes of its analysis that Buridi's allegations satisfied the remaining elements, though it stated that it was not convinced that they had. Therefore, we must first decide whether there are facts in the record that sufficiently establish that Buridi's reliance on the loan commitment letter was reasonable or, at a minimum, raises a question.

The parties dispute what constitutes reasonable reliance. Buridi argues that the district court erroneously faulted him for not investigating the veracity of every statement of material fact made in the course of negotiations or in the inducement to guarantee the loan, thereby subjecting him to an unnecessary obligation to independently investigate. Citing *Field v. Mans*, 516 U.S. 59, 70 (1995), Buridi contends that a recipient of a misrepresentation is justified in relying upon its truth even when the falsity is ascertainable through investigation. Buridi further argues that BB&T is wrong to suggest that he should have demanded to inspect the construction plans, bids from the construction companies, and the construction contract, all of which indicated that the hospital was otherwise being constructed to hold 34 beds. The way he sees it, because there were no obvious indications or "red flags" that might have reasonably caused him to question the veracity of the loan commitment letter, he did not have reason to request the documents.

BB&T, on the other hand, argues that Kentucky case law unquestionably places a duty upon all plaintiffs pleading fraud to reasonably look into the veracity of a material representation made by the opposing party. The district court agreed. Relying upon *Options Home Health of*

*N. Fla., Inc. v. Nurses Registry & Home Health Corp.*, 946 F. Supp. 2d 664, 671 (E.D. Ky. 2013), the district court reasoned that a plaintiff alleging fraud has a minimum duty to "exercise some due diligence or perform at least some investigation into the factual basis of the representation, particularly where he possesses some relevant experience."

In *Options Home Health of N. Fla. Inc.*, the parties entered into an asset purchase agreement that arranged for the sale of all of the seller's assets for a price of $650,000. 946 F. Supp. 2d at 667. The seller alleged that the buyer breached the agreement and was unjustly enriched. *Id.* at 672. The buyer counterclaimed for fraud and negligent misrepresentation, alleging that the seller fraudulently induced him to purchase its assets by misrepresenting plans by the state of Florida to introduce a moratorium on the transfer of home health agencies. *Id.* at 669–70. The seller purportedly agreed to the contract because the seller insisted that if the buyer wanted to purchase its assets, the buyer should move quickly. *Id.* at 670. However, the court found that the buyer failed to conduct any "independent research of his own to determine the reliability of this statement," but instead "assumed that since [the sellers] were in Florida, they would have inside information about a potential moratorium should one exist." *Id.* at 671.

Buridi disagrees with the district court's comparison of his case to *Options*. He argues that the "theoretical possibility that [he] could have demanded copies of the hospital construction documents" that revealed the number of beds under construction should not solely render his reliance on the loan commitment letter unreasonable. He argues that, unlike in *Options*, the "60-bed" term did not seem incredible. Buridi believed the reference to 60 beds in the loan commitment letter meant that the hospital would be licensed by the state of Indiana for 60 revenue-generating beds. However, based on his stated understanding, the 60-bed term would have to read as a financial projection, as opposed to a contractual promise. Though, it would

have been impossible for BB&T to know before construction was complete how many beds the state of Indiana would ultimately license the hospital to utlize. To this end, read as a financial projection, the 60-bed term cannot amount to a fraudulent statement under Kentucky law. *See Flegles*, 289 S.W.3d at 549.

In *Flegles*, the defendant made similar sales performance and profitability predictions that failed to materialize. *Id.* at 554. The plaintiff, who complained of suffering pecuniary losses after relying on the defendant's sales performance and profitability predictions, alleged that the defendant corporation fraudulently induced it to become a member of its organization. *Id.* at 547. The Kentucky Supreme Court ruled that "forward-looking projections or opinions, even if ultimately proven incorrect, do not amount to fraud." *Id.* at 554. If such predictions could amount to fraud, the court reasoned, anyone who makes mere business projections "would proceed at great peril" and be subject to liability even when the projections are not realized due to factors beyond the predictor's control. *Id.*

Given the *Flegles* decision, Buridi likewise cannot establish under Kentucky state law that he reasonably relied on the loan commitment letter without presenting some form of due diligence. Therefore, we need not address the other elements of fraud. Accordingly, the district court correctly found that no genuine issue of material fact existed as to this claim.

B.

Buridi argues next on appeal that the district court erroneously found that, as a matter of law, he is not entitled to recover for breach of the covenant of good faith and fair dealing. However, the district court found that there was no evidence to support Buridi's claim that BB&T breached an implied covenant of good faith and fair dealing, nor that BB&T owed Buridi a fiduciary duty. As the district court correctly stated, this Court explained in *Sallee v. Fort*

*Knox Nat'l Bank, N.A.*, 286 F.3d 878, 893 (6th Cir. 2002) that banks do not generally have fiduciary relationships with their debtors, such that lenders would owe a duty to borrowers. Courts have found their interests to be too different to reconcile. *Id.*

According to Kentucky law, "[t]he primary object in construing a contract . . . is to effectuate the intentions of the parties." *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x 451, 455 (6th Cir. 2005) (alteration in original) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). Every contract contains an implied covenant of good faith and fair dealing, which imposes upon the parties a duty to act in a bona fide manner. *Farmers Bank & Trust Co. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005). To demonstrate a violation of the implied covenant of good faith and fair dealing, a plaintiff must provide evidence sufficient to support a conclusion that the defendant engaged in some conduct that denied the plaintiff the benefit of the bargain originally intended by the parties. *O'Kentucky*, 147 F. App'x at 457–58.

An implied covenant of good faith and fair dealing, however, does not prevent a party from exercising its contractual rights. *de Jong v. Leitchfield Deposit Bank*, 254 S.W.3d 817, 824 (Ky. Ct. App. 2007). Here, Buridi has failed to demonstrate that he was denied the benefit of the bargain. Neither has he shown that BB&T owed him a fiduciary duty. Buridi only contends that BB&T acted in bad faith by concealing the fact that KMC would not construct a 60-bed facility, but, the record does not support that BB&T would have known anything more than what Buridi could have known. Therefore, BB&T did not have a duty to advise its borrowers or their guarantors as to the wisdom of their business decisions. As a guarantor, Buridi should have apprised himself of the soundness of the loan's ultimate use prior to obligating himself. By the very fact that the bank was requesting that he sign a guaranty agreement, he should have also

been aware that there was some risk of the principal borrower not being able to satisfy its financial obligation under the loan agreement. *See id.* Such risk was part of the contract. Therefore, Buridi is not entitled to recover on his claim for breach of the duty of good faith and fair dealing.

III.

Accordingly, we **AFFIRM** the judgment of the district court.