Mildred ABBOTT, Barbara Abel, Elizabeth Abney, Lisa Abraham, Pamela Abrams, Elizabeth Adams, Cathy Adams, Phyllis Adams, Ruby Adams, Ruby Adamson, Susan Adkins, Clantha Akers, Effie Alsip, Juanita Alton, Joann Alvey, Phyllis Applegate, Cindy Armstrong, Susan Arvin, Clara Atkinson, Karen Austin, Linda Back, Jamie Bailey, Mary Ann Bailey, Vickie Bailey, Charlotte Baker, Charlotte Baker, on behalf of the Estate of Lane Walker, David Walker, on behalf of the Estate of Lane Walker, Jody Baldridge, Carla Baldwin, Sarah Balenovich, on behalf of the Estate of Edith Browning, Carol Barnes, on behalf of the Estate of Danny Abney, Marilyn

Barnes, Lee Bartley Jr, Teresa Baumgardner, Debra Bays–Plybon, Melissa Faye Beamon, Linda Beggs, Patricia Belcher, Leisa Belding, Eleanor Berry, Margie Berry, Margaret Bingham, Easter Bishop, Emma Black, Janice Blair, Sharon Blair, Carol Boggs, Lori Boone, Joie Botkins, Kathy Bowling, Angie Lynn Bowman, Virginia Braden, Ladonna Brame, James Branham, Kathy Branham, Ruby Branham, Brenda Bray, Norma Brewer, Vickie Brewer, Alma Brock, Glenna Brock–Powell, Peggy Broughton, Barbara Brown, Joyce Brown, Karen Brown, Sharon Brown, Deborah Browning, Nathaniel Brumfield, on behalf of Wathalee Brumfield, Billie Brumley, Linda Brumley, Kimberly Brummett, Teresa Bruner, Patricia Bryant, Christina Bucher, Leslie Bullock, Judy Bundy, Warren Burgess, Janice Burton, Tina Bush, Sherrie Butler, Donna Campbell, Loretta Campbell, Buel Cantrell, Linda Carr, Tonya Carter, Wallace Carter, Charlotte Cason, Lisa Caudill, Connie Sue Centers, Tony Childers, Gloria Clark, William Clark, Rosemary Click, Pamela Clift, Danielle Clore, Allen Coker, Judy Coleman, Shirley Coleman, Tara Coleman, Debra Collier, Margaret Collier, Opal Collins, Linda Colvin, Phyllis Combs, Carolyn Conley, James Cook, Ronnie Cook, Janet Coons–Greene, Georgia Coots, Mark Cornn, Sandra Cotton Gilley, Nadine Couch, Joseph Cowley, Jo Ann Cox, Barbara Crain, Doris Creech, Deloris Criswell, Pamela Crowe, Tracy Curtis, Doris Dabney, Darby Daniels, Kathy Daniels–Stephenson, Mary Daughtery, Betty Davidson, on behalf of the Estate of Evelyn Jackson, Ginger Davidson–Gibson, Elizabeth Davis, Sandra Davis, Karen Dean, Bobbie Deaton, Jan Delaney, Regina Despain, Judy Dile, Gerry Dixon, Al Doser, Belva Dotson, Teresa Duff; Linda Dunaway, Ynetta Eckert, Tami Edwards–Engle, Martha Elliot, Saundra Erp, Charlotte Estepp, Sarah Estes, Susan Ezell, Elizabeth Fannin, Janet Fentress, Haywood Ferguson, on behalf of the Estate of Alma Ferguson, William Fitch, on behlaf of the Estate of Shelia Fitch, Vickie Flannery, Paul Floyd, Bernita Flynn, Rhonda Flynn Osburn, Berenda Ford, Rhonda Franklin, Timothy Franklin, Mary Frazier, Essie Fredrick, Freda Frizzell, Beulah Fugate, Clara Fulks, Patricia Gaunce, Barbara Gay, Melissa Gayheart, Ken Gayheart, James Gibson, on behalf of the Estate of Jessie Gibson, Joni Gibson, Tara Gifford, Gladys Gilbert, Stephanie Gist, Ruby Godbey, Eddie Golden, Debra Goode, Joyce Gordon, Patrick Graham, Tammy Grant, Amy Gray, Donna Green, Sherrie Green, Peggy Grigsby, Allie Hall, Geraldine Hall, Norma Hall, Shannon Hall, Barbara Hampton, Rhonda Hancock, Leona Gail Handley, Joyce Hanley, Rebecca Harris, Debra Harrison, Diane Harrison, Joyce Hassler, Yolanda Hayden, Barbara Heizer, Barbara Hellmueller, Reva Helton, Wanda Helton, Bonnie Henderson, Gary Hendrickson, Vikki Henley, Vickie Henry, Marcus Highley, Charlene Hill, Karen Hillard, Janice Hilton, Linda Hinkle, Jacqueline Hocker, Gwen Holt, Tami Holt, Myra Hood, Vickie Hood, Lora Hoover, Evelyn Hopkins, Charlene Horn, Mary Horning, Cloyd Hoskins, Linda Hoskins, Marilyn Howard, Mary Howard, Toloria Howard, Donna Howser, Charlotte Hughes, Marcia Hughes, Margie Hulse, Sheila Humpreys, Margaret Hunt, Wanda Hunter, Brenda Hutchcraft, Lorene Hutcherson, Katherine Hutchinson, James Ingram,

Emma Ison, Della Jackson, Katina Jackson, Mary Jackson, Linda James, Lynn Jefcoat, Debbie Jeffrey, Garnett Johnson, Ernestine Leslie Johnstone, Beulah Jones, Franklin Jones, Gerry Jones, Judy Jones, Kathy Jones, Linda Jones, Marlene Jones, on behalf of the Estate of Loretta Edmond, Stewart Jones, Troy Jones, Betty Jordon, Betty Kelley, April Keltner Nuxoll, Gerald King, Katherine King, Pattie Kitts, Betty Kluck, Lucille Krey, Bill Lady, on behalf of the Estate of Mary Lady, Linda Larkins, Angela Lewis–Mullinnix, Emily Lewis, Beverly Little, Sandra Dee Littleton, Lois Lockard, on behalf of the Estate of Lloyd Lockard, Linda Long, Sherry Long, Kathy Lovan–Day, Nona Lucas, Charlotte Lush, Linda Malone McGowan, Paula Mann, Pamela Marlowe, Arlene Marshall, Bobbie Martin, Linda Martin, Mary Martin, Connie Mason, Joni McClanahan, Lavonna McDaniel, Connie McGirr, Roberta McGuire, Tammy McGuire, Jacquelyn McMurtry, June McPhearson, Sheila Lynn Meece, Thelma Merida, Andrea Messamore, Wanda Metzger, Deloris Miller, Linda Miller, Linda L. Miller, Marie Miller, Nellie Miller, Orene Salyer Miller, Belinda Million, Leslie Minton, William Miracle, on behalf of the Estate of Kathy Miracle, Beverly Mitchell, Eudora Montgomery, Ella Moore, on behalf of the Estate of Jonnetta Moore, Margaret Moore, Rhonda Moore, April Morris, Louisa Moss, Donna Muddiman–Cornish, Aileen Mullins, Mary Napier, Wanda Faye Neace, Elizabeth Neal, Linda Nevels, Diana Newlin, Wilma Noe, Kathy Nolan, Shelia Nolan, Glenora Pace, Bertha Pack, Raymond Parker, Louverna Parks, Myrtle Parris, Jessie Parsons, Angela Peace, Judith Peck Wageman, Lisa Peek, Recie Pennington, Helen Perkins, Jeff Perkins, Joe Ann Perkins Spencer, Stacy Perkins, Joy Perry, on behalf of the Estate of Milton Lewis, Doris Phelps, Norma Pickett, Sonja Pickett, Kathy Pollitte, Brian Powell, Mary P'Pool, Trena Preston, Suzanne Price, Rita Profitt–Norman, Lynne Pursel, Sharon Rainwater, Billie Reese, Brenda Rentas, on behalf of the Estate of Anthony Rentas, Arlie Rhodes, Evelyn Rhodes, Raymond Riley, Levetta Riviera, Odena Roaden, Billie June Roberts, Dyan Roberts, Patricia Roberts', Renee Roberts, Patricia Robinson, Fetina Robinson, Carol Rogers, Cathy Rose, Vina Rose, Larry Roseberry Jr, on behalf of the Estate of Larry Roseberry, Sr., Bobby Sallee, Mary Sams, Kathy Sands, Justus Scharold, Crystal Seals–Gibson, Maxine Seals, Claudia Sebastian–Shepard, Lisa Sexton, Monica Sexton, Terry Shanks, Margaret Sharon, Michelle Sharpe Roberts, Debra Shepherd, Janet Short, Linda Caudill, on behalf of the Estate of Laureda Short, Monica Shuffett, Loretta Sidwell, Ada Sizemore, April Slniten–Jones, Carole Slone, Barbara Smith, Elaine Smith, Freda Smith, Wesley Smith, on behalf of the Estate of Sharon Smith, Peggy Spears, Corina Stearns, Cora Stapleton, Debbie Staton, Paul Stauffer, Connie Stephens, Nancy Stephens, Sharon Stevenson, Marlene Stewart, Betty Stone, Donna Stromowsky, Connie Sturgill, Shirley Sudduth, on behalf of the Estate of Marjorie Sudduth, Pam Sullivan, on behalf of the Estate of Rebecca Lovell, Sharon Stephens, on behalf of the Estate of Rebecca Lovell, Mildred Swanson, Lisa Swiger, Ella Tackett, Patty Tackett, Priscilla Tafolla, Charles Tapley, Ella Taylor, Linda Taylor, Jeanne Thomas, Elizabeth Thompson–Washburn, Karen Thompson McClain, Nancy Thomp-

son, James G. Thurman, Lisa Grant Thurman, Steve Toller, on behalf of the Estate of Linda Toler, Roy Toyler, Elizabeth Trent, Jenny Trimble, Joetta Tucker, Deborah Turner, Drucilla Turner, Marie Turner, Patricia Turner, Valorie Turner, Linda Vance, Linda Vanarsdall–Collins, Debbie Vogt Schneider, Bobbie Walker, Lorene Wallen, Cindy Walters, Betty Ward, on behalf of the Estate of Martin Ward, Wanda Watkins, Cheryl Watson, Irene Wells, Joyce Goff Wells, Judy Whitaker, Kim White, Mary White, Patricia White, Catherine Whitlock, Joyce Whitt, Betty Widener, Peter Wilds, Carol Quisenberry Williams, Todd Williams, on behalf of the Estate of Gloria Williams, Bethany Willinger, Geneva Wilson, Robert Wilson, Melody Winer, Connie Wolfe, Bill Wombles, Amanda Edwards Wood, Artie Woods, Fern Wooten, Deborah Wright, Edwina Wright, Roger Wright, Sandra Wright, Tammy Wright, Doyle Yancy, Sheila Yates, Karen Young, Sandra Zehman, Appellants

v.

Stanley M. CHESLEY, Shirley A. Cunningham, Jr., William J. Gallion, and Melbourne Mills, Jr., Appellees.

No. 2011–SC–000291–DG.

Supreme Court of Kentucky.

Aug. 29, 2013.

Rehearing Denied Dec. 19, 2013.

 

 
 
 

 
 

Angela Margaret Ford, for Appellants.

Frank V. Benton, IV, Newport, James M. Gary, Sheryl G. Snyder, Griffin Terry Sumner, Louisville, John Kendrick Wells, IV, for Appellee, Stanley M. Chesley.

Andre Fereole Regard, Lexington, for Appellees, Shirley A. Cunningham, Jr. and William J. Gallion.

Calvin Ray Fulkerson, James A. Shuffett, John Christian Lewis, Lexington, for Appellee, Melbourne Mills, Jr.

Opinion of the Court by Justice VENTERS.

This case arose in the aftermath of the settlement of *Darla S. Guard, et al. v. American Home Products, Inc. (Guard).*[1] The *Guard* case, which is also known as *"Jonetta Moore, et al. v. American Home Products, Inc.,"* or the *"Moore"* case, was brought by Kentucky residents who had taken the popular diet drug known as Fen–Phen. Each Appellant/Cross–Appellee (collectively "Appellants") was a plaintiff in the *Guard* case and was represented under a contingent fee contract by Appellees/Cross–Appellants (collectively "Appellees")[2] Shirley A. Cunningham, William J. Gallion, or Melbourne Mills, Jr. Appellee Stanley M. Chesley later joined the plaintiffs' team of attorneys. Appellants' complaint alleges that Appellees breached their fiduciary duties by wrongfully retaining or by improperly disbursing a substantial portion of the *Guard* case settlement money that should have gone to Appellants.

The trial court granted Appellants a partial summary judgment on the claim that Cunningham, Gallion, and Mills ("CGM")[3] breached their fiduciary duty. The trial court concluded that genuine issues of material fact existed in connection with Chesley's role, and so the motion for summary judgment against him was denied. The Court of Appeals reversed the partial summary judgment against CGM and remanded the case against them for further proceedings. It declined Appellants' request for review of the trial court's

1. Boone Circuit Court Civil Action No. 98–CI–795.

2. In this opinion, "Appellees" refers to all Appellees, i.e. Cunningham, Gallion, Mills, and Chesley.

3. Some of the alleged wrongful conduct relates in common to Cunningham, Gallion, and Mills, but not to Chesley. Therefore, upon occasion as appropriate, we refer to Cunningham, Gallion, and Mills collectively as "CGM." Otherwise, we refer to each Appellee individually. References to CGM do not include Chesley.

denial of summary judgment against Chesley.

On discretionary review, we now address the following issues:

1) Whether the Court of Appeals erred in reversing the partial summary judgment entered against CGM;

2) Whether the Court of Appeals erred by declining to review the trial court's denial of summary judgment against Chesley;

3) Whether the trial court could impose upon CGM joint and several liability for the damages sustained by Appellants;

4) Whether the Court of Appeals erred in affirming the trial court's decision refusing to transfer the case from the Boone Circuit Court to the Fayette Circuit Court; and,

5) Whether the trial court erred in crediting the monetary judgment against CGM with undocumented expenses that Mills claimed he incurred in the *Guard* case.

For the reasons set forth below, we reverse the Court of Appeals' opinion upon the issue of CGM's breach of fiduciary duty and reinstate the partial summary judgment entered against CGM by the trial court. We also conclude that the imposition of joint and several liability against CGM was proper, and so we likewise reverse that aspect of the Court of Appeals' opinion. In addition, we affirm the Court of Appeals' conclusion that the denial of summary judgment against Chesley was not an appealable issue; we affirm the Court of Appeals' determination that the Boone Circuit Court properly refused to transfer the case to the Fayette Circuit Court; and we agree with Appellants that the trial court erred by crediting CGM with the undocumented expenses claimed by Mills.

## I. FACTUAL AND PROCEDURAL BACKGROUND

After discovery in the mid–1990s that the popular weight-loss drug combination of fenfluramine and phentermine known as Fen–Phen was linked to heart damage and other dangerous side-effects, Fen–Phen was taken off the market. American Home Products (American Home), the manufacturer of Fen–Phen soon faced several lawsuits by Fen–Phen users. Appellees Cunningham, Gallion, and Mills were Kentucky attorneys with separate law practices. However, they pooled their talents and resources into a collective effort to represent some 431 individual plaintiffs, all of whom were Kentucky residents who had taken Fen–Phen. Each of the 431 plaintiffs had signed a contingent fee contract with Cunningham, Gallion, or Mills. Cunningham's clients had agreed to a contingent fee of "33 1/3% of the total sum recovered, whether by settlement or by trial ..." plus reimbursement for expenses "directly incurred in investigating or litigating this claim...." Gallion's contingent fee agreement provided for "33% of the total sum recovered, whether by settlement or by trial ..." plus expenses "incurred in investigating or litigating this claim[.]" Mills's contingent fee agreement provided that "Attorney's fees shall be set by the court, but shall not be more than 30% of the client's net recovery." Expenses were to be "repaid [to the attorney] off the top before calculation of fee."

In the early stages of the litigation, Appellees had the case certified by the Boone Circuit Court as a class action. Chesley had only a few Fen–Phen clients, but he had experience in the settlement of Fen–Phen proceedings, having served on the management committee of the national Fen–Phen class action litigation. Because of Chesley's experience and national reputation, CGM agreed to his participation in the *Guard* case. Chesley, Gallion, Cun-

ningham, Mills, and an attorney from Cincinnati named Richard Lawrence who also represented a few individual Fen–Phen claimants, entered into a written agreement outlining the role each attorney was to perform in the litigation and agreeing upon a method of sharing the fees earned in the case. Gallion would serve as lead trial counsel in the event the case was tried, and would prepare the case accordingly. Cunningham and Mills would enroll clients and maintain client contact information. Chesley would act as "lead negotiator" in the effort to secure a collective settlement of the claims.

The written agreement provided that if a negotiated settlement was achieved, Chesley would take a 21%-share of the combined attorneys' fee; CGM would split 74% of the total fee among themselves and their associates; and Richard Lawrence, who is not a party to this case, would take 5%. If a negotiated settlement was not achieved, the lawyers agreed that Chesley would get 15% of the fees generated by a verdict and CGM would share 80%, with Lawrence receiving the remaining 5%. The agreement also provided that "all parties to this agreement shall have the right to review all contracts between themselves and any other parties that may affect the fees earned and all clients shall be advised of this agreement." The agreement further provided that "all parties to this agreement shall be identified as co-counsel in the class action styled *Guard v. American Home Products* in Boone Circuit Court in Kentucky." Appellants however were not made aware of this agreement among the attorneys.

Eventually, American Home agreed to pay an aggregate sum of $200 million to settle the claims of all of the *Guard* case claimants. The settlement agreement provided that Appellees would obtain, in the Boone Circuit Court, the decertification of

the *Guard* class action and the dismissal of all the individual claims. The settlement fund, less $7.5 million to be reserved for possible future claimants, was allocated among the 431 clients with whom CGM had fee contracts. The claims of 143 other individuals, who had joined the class action but had not personally retained any of Appellees, were dismissed without prejudice with the expectation that those individuals could elect to join the national settlement. American Home left it to CGM to determine how much of the fund would be allocated to each client. However, the settlement agreement required Appellees to provide a scheduled accounting for the amount allocated to each individual claimant.

Contrary to the terms of the settlement agreement, none of the Appellants were informed of the terms of the settlement. Nor were they told that a settlement fund of $200 million was established. They were also not told that their attorneys were determining how to apportion the settlement fund. Instead, each Appellant was falsely told that American Home had made a specific, individualized offer to settle his or her claim. After the Boone Circuit Court decertified the class action, Appellees distributed to Appellants $73,296,864.96 with no order of approval from the court. They also established a non-profit organization named Kentucky Fund for Healthy Living (KFHL) to which they diverted $20 million. The balance of the money, some $106 million, they divided among themselves pursuant to their written agreement.

It was eventually discovered that the attorneys' fees retained by Appellees far exceeded the 30% to 33.33% allowable under the contingent fee agreements. Appellants filed suit in the Fayette Circuit Court demanding an accounting of the *Guard* case settlement money, the dis-

gorgement of misappropriated funds traced to the *Guard* case settlement, and judgment against Appellees for money they paid themselves in excess of the contingent fee contracts.

Upon motion of Appellees, the Fayette Circuit Court determined that the Boone Circuit Court was the proper venue for the action. Over Appellants' objection, the case was transferred to the Boone Circuit Court. More than two years after the case was transferred to the Boone Circuit Court, and after several volumes of pleadings had been filed there, Appellants moved that court to transfer the case back to the Fayette Circuit Court. Appellants argued that the Boone Circuit Court was an improper venue, that the Fayette Circuit Court was the only proper venue, and that Fayette County provided a more convenient forum for the parties. The Boone Circuit Court denied the motion.

In due course, Appellants moved for partial summary judgment. The trial court first concluded as a matter of law that, by violating their contingent fee agreements with their clients, Cunningham, Gallion, and Mills had breached their fiduciary duty to Appellants. It granted Appellants a partial summary judgment on that issue.

Later, and after additional proceedings, the trial court granted Appellants summary judgment on the issue of compensatory damages for the breach of fiduciary duty. Based upon what it described as "uncontroverted facts," the trial court concluded that Appellees paid themselves and others a total of $126,793,551.22 from the

*Guard* case settlement while the contingent fee contracts limited their fees to a maximum of $60,798,783.14.[4] The trial court also concluded that Appellees were entitled to a credit of $1.5 million for undocumented and previously undisclosed expenses Mills claimed he incurred in the Fen–Phen litigation. The trial court then did the math to ascertain that Appellees wrongfully withheld from Appellants a total of $64,280,497.00. Rounding off the figures to Appellees' advantage, and subtracting the $20.5 million used to fund the KFHL, the trial court awarded Appellants judgment against Cunningham, Gallion and Mills in the sum of $42 million, plus interest at 8%.

The trial court also held that Cunningham, Gallion, and Mills were jointly and severally liable to Appellants. It further determined that Appellants were entitled to a judgment imposing a constructive trust upon the funds remaining with KFHL.

The trial court reserved for trial the issues of Appellees' liability on the Appellants' claims concerning negligent or fraudulent misrepresentation, punitive damages, and whether Appellees should be denied the right to claim any fee. Significantly, the facts surrounding Chesley's professional relationship with Appellants differed from the facts that defined CGM's relationship with the clients. As a consequence, the trial court found that genuine issues of fact remained regarding Chesley's liability, and so it denied Appellants' motion for summary judgment against him.[5]

---

4. Based on a collaborative agreement between the attorneys, Chesley was entitled to $12,767,744.45 and CGM were collectively entitled to $44,991,099.52.

5. The mishandling of the *Guard* case settlement fund resulted in several attorney disciplinary actions. Cunningham, Gallion, Mills,

and Chesley were permanently disbarred from the practice of law in the Commonwealth. *See Cunningham v. Kentucky Bar Ass'n,* 266 S.W.3d 808 (Ky.2008); *Gallion v. Kentucky Bar Ass'n,* 266 S.W.3d 802 (Ky. 2008); *Kentucky Bar Ass'n v. Mills,* 318 S.W.3d 89 (Ky.2010); and *Kentucky Bar Ass'n*

On appeal to the Court of Appeals, CGM challenged the entry of summary judgment on the breach of fiduciary duty claim and the assessment of joint and several liability. Appellants cross-appealed the trial court's denial of their motion to transfer venue, the denial of summary judgment against Chesley, and the deduction of Mills's purported expenses from the compensatory award.

The Court of Appeals reversed the trial court's award of summary judgment on the Appellants' breach of fiduciary duty claim upon its conclusion that genuine issues of material fact remained unresolved.[6] The Court of Appeals concluded that the order denying summary judgment against Chesley was not appealable, and therefore declined to review it. The Court of Appeals affirmed the trial court's ruling on the venue issue; it did not rule on the issues of Mills's claimed expenses and joint and several liability because the reversal of the summary judgment rendered those issues moot. Upon Appellants' motion, we granted discretionary review.

## II. APPELLANTS WERE ENTITLED TO SUMMARY JUDGMENT AGAINST CUNNINGHAM, GALLION, AND MILLS ON THE ISSUE OF LIABILITY

The trial court entered partial summary judgment, adjudicating that Cunningham, Gallion, and Mills had breached their fiduciary duty to Appellants by taking a portion of the Fen–Phen settlement fund that greatly exceeded the attorneys' fees agreed upon in Appellants' individual contingency contracts, thereby reducing the net recovery available to each Appellant. The Court of Appeals set aside the summary judgment because it concluded that Kenneth Feinberg's affidavit raised a genuine issue of fact material to the breach of fiduciary duty issue. Feinberg is a nationally recognized authority on the settlement of mass tort litigation. He opined that the attorneys' fees taken by CGM and the diversion of $20 million to KFHL was "not out of the ordinary" for a "class action or common fund or aggregate mass tort settlement," and that the client fee contracts did not control CGM's proper share of the settlement fund. Appellants contend that Feinberg's affidavit is merely his opinion on an issue of law and controverts none of the essential facts upon which Appellants' claims are based.

We agree that Feinberg's comments have no impact on the propriety of the summary judgment because they shed no light whatsoever on any material issue of fact. At most, Feinberg's affidavit suggested that the manner in which CGM apportioned the settlement fund among themselves and their clients was common and, perhaps, not unreasonable. But because the pertinent facts are otherwise not in dispute, the question of whether their conduct amounted to a breach of fiduciary duty is a question of law for the trial court to decide. It is not an issue of fact to be resolved at trial. Our review of the record convinces us that, under the particular cir-

v. *Chesley*, 393 S.W.3d 584 (Ky.2013). An associate of Gallion and the judge who presided over the *Guard* action were also disbarred due to their conduct relating to the case. *See Kentucky Bar Ass'n v. Helmers*, 353 S.W.3d 599 (Ky.2011) and *Kentucky Bar Ass'n v. Bamberger*, 354 S.W.3d 576 (Ky.2011).

**6.** The Court of Appeals identified the following material issues of fact: 1. Whether the settlement was to be split in its entirety among the 431 settling plaintiffs; 2. Whether the Appellees were obligated to indemnify American Home Products; 3. Whether the plaintiffs were fairly and adequately compensated; and 4. Whether the plaintiffs were entitled to the money used to fund the Kentucky Fund for Healthy Living.

cumstances of this case, the Feinberg affidavit did not generate a genuine issue of material fact.

■ Our review of the record discloses no genuine issue of fact regarding the conduct that Appellants claimed to be a breach of CGM's fiduciary duty to them. As the trial court aptly observed, "one need go no further than an analysis of two exhibits to conclude that [CGM] breach[ed] their fiduciary duty to [Appellants] in the underlying case." The two exhibits are the fee contracts and a schedule showing the receipts and disbursements of the settlement fund. The veracity of those exhibits was not challenged and the facts they established were not disputed. It was also undisputed that Appellants did not agree to any modifications of their fee agreements and that they received no notice of CGM's fee disbursements. The trial court calculated from these uncontroverted facts that the contingent fee contracts allowed Appellees· to be paid attorneys' fees of $60,798,783.14. The trial court determined from what it referred to as "simple arithmetic" that the lawyers distributed to themselves and to KFHL $126,793,551.22. After rounding-off the numbers to Appellees' advantage and giving them credit for $1.5 million in undocumented expenses claimed by Mills, the trial court determined that Appellees were indebted to Appellants collectively in the sum of $42 million.

Thus, the only question for the trial court was whether those facts established a breach of fiduciary duty that entitled Appellants to summary judgment on CGM's liability as a matter of law. We conclude that they did, and so we reverse the Court of Appeals upon the breach of fiduciary duty issue.

■ As was noted in *Daugherty v. Runner*, the attorney-client relationship is at once both contractual and fiduciary:

> The relationship of attorney-client is a contractual one, either expressed or implied by the conduct of the parties. The relationship is generally that of principal and agent; however, the attorney is vested with powers superior to those of any ordinary agent because of the attorney's quasi-judicial status as an officer of the court; thus the attorney is responsible for the administration of justice in the public interest, a higher duty than any ordinary agent owes his principal. Since the relationship of attorney-client is one fiduciary in nature, the attorney has the duty to exercise in all his relationships with this client-principal the most scrupulous honor, good faith and fidelity to his client's interest.

581 S.W.2d 12, 16 (Ky.App.1978). The attorney-client relationship is a fiduciary relationship that subjects the attorney to the duties of honesty, loyalty, and good faith. *See Clark v. Burden,* 917 S.W.2d 574, 575 (Ky.1996) (quoting *Daugherty,* 581 S.W.2d at 16). Indeed, a fiduciary duty is "the highest order of duty imposed by law." *In re Sallee,* 286 F.3d 878, 891 (6th Cir.2002).

The intertwining of an attorney's contractual duty to the client and his/her fiduciary duty to the client is even more pronounced in this case because the fiduciary duty Appellees allegedly breached was the concomitant contractual duty to charge a fee in accordance with the attorney-client fee agreements. Indeed, it might reasonably be said that the most elementary aspect of an attorney's fiduciary duty of honesty and loyalty to his client would be to honor the fee contract by taking no fees in excess of the authorized contractual amount and ensuring that the client receives his agreed-upon share of the settlement.

■ Appellees do not reasonably dispute the amount of fees they took or the

amount the contingency fee contracts provided. They argue only that those facts are not material because the consolidation of Appellants' cases into a class action relieved them from the limitations of the fee contracts and allowed them to take whatever fee the trial court in the *Guard* case deemed "reasonable" attorneys' fees. Their argument, however, ignores the undisputed facts that, pursuant to the settlement agreement with American Home, the class action was decertified, the claim of each individual Appellant was settled from the fund established by American Home as if there had been no class action, and the trial judge who allowed the exorbitant fees was disbarred for his collusion in the fraudulent class-action fee scheme.

The trial court correctly perceived that, as a matter of law, CGM were obligated, contractually and as fiduciaries, to honor the attorney-client fee agreements. Appellants never released them from the obligations of the fee contracts, and without the clients' consent they could not enfold the cases into a class action, secure a lucrative fee with the help of a collusive trial judge, and then decertify the class to remove the possibility that additional claimants may appear and demand a share. The contingency fee agreements between CGM and Appellants were valid contracts that governed the portion of the settlement fund that could be properly paid to CGM. It is beyond rational dispute that CGM breached their fee agreements with Appellants by claiming excessive fees and, in doing so, that CGM failed to ensure that each Appellant received his or her contractual share of the settlement.

■ Additionally, Mills contends that he did not breach the contingency fee agreements with his 311 clients because the fees he personally received did not exceed 30% of the collective settlement obtained for his clients. Whether true or not, that asser-

tion does not create a material fact that could overcome a motion for summary judgment because it remains undisputed that Mills did not protect his individual clients by ensuring that they received the 70% of their compensatory award as promised by the contract. As we describe in detail below, Mills's association with Gallion and Cunningham in the handling of this case was a joint adventure. Regardless of his personal take, there is no doubt that Mills stood by as his business associates collectively retained more of his clients' money than they were entitled, and that was a breach of his duty of fidelity to his clients.

■ CGM also assert that fees in excess of the fee agreements were justified as compensation because, in order to win any compensation for their clients, CGM had to obligate themselves to indemnify American Home against any additional claims that may arise within the year following the settlement. That argument, however, runs aground on the undisputed fact that CGM did not secure their clients' consent to the settlement agreement, to the indemnity provision contained therein, or for any modification of the contingent fee contract. "Generally, one party may not unilaterally modify a contract; mutual assent is required." 17A C.J.S. *Contracts* § 545 (2013). *See also Ky. Home Mut. Life Ins. Co. v. Leitner,* 302 Ky. 789, 196 S.W.2d 421, 424 (1946) (quoting 12 Am.Jur. 988, § 410) (" 'Any executory contract which is bilateral in the advantages and obligations given and assumed may at any time after it has been made and before a breach thereof has occurred be changed or modified in one or more of its details by a new agreement also bilateral by the mutual consent of the parties without any other consideration.' ").

There are no material facts in dispute, and plain application of the law to the

undisputed facts demonstrates that CGM, by taking greater fees than their contracts allowed and leaving a correspondingly lesser share of the settlement money for their clients, breached their contracts with Appellants and simultaneously breached their fiduciary duties to Appellants. The trial court correctly concluded that the breach of those contracts was a breach of CGM's fiduciary duties to Appellants. The trial court properly granted partial summary judgment on that issue. We therefore, reverse the Court of Appeals and reinstate the partial summary judgment of the Boone Circuit Court subject to our ruling below on the issue of credit for undocumented expenses claimed by Appellees.

## III. THE ORDER DENYING APPELLANTS' MOTION FOR SUMMARY JUDGMENT AGAINST CHESLEY WAS NOT APPEALABLE

The trial court granted Appellants' motions for partial summary judgment against CGM but denied their motion for summary judgment against Chesley. Appellants appealed that order but the Court of Appeals declined to consider the issue. Appellants argue now that the Court of Appeals erred in refusing to consider Appellants' appeal of the order denying summary judgment against Chesley.

■■■■■■ CR 56.03 provides:

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

"The general rule under CR 56.03 is that a denial of a motion for summary judgment is, first, not appealable because of its interlocutory nature and, second, is not reviewable on appeal from a final judgment where the question is whether there exists a genuine issue of material fact." *Transp. Cabinet, Bureau of Highways, Commonwealth of Ky. v. Leneave*, 751 S.W.2d 36, 37 (Ky.App.1988); *see Gumm v. Combs*, 302 S.W.2d 616, 616–17 (Ky.1957) ("An order denying a motion for summary judgment is not *appealable*."). However, under an exception to this general rule, appellate review is proper if "(1) the facts are not in dispute, (2) the only basis of the ruling is a matter of law, (3) there is a denial of the motion, and (4) there is an entry of a final judgment with an appeal therefrom. Then, and only then, is the motion for summary judgment properly reviewable on appeal." *Leneave*, 751 S.W.2d at 37; *see also Gumm*, 302 S.W.2d at 617.

■■■■ Upon our review of Appellants' arguments, we find no reason to depart from the general rule described above. We agree with the Court of Appeals' conclusion that denial of the motion for summary judgment against Chesley was interlocutory and not appealable, and therefore we affirm its judgment in that respect.

## IV. CUNNINGHAM, GALLION, AND MILLS ARE SUBJECT TO JOINT AND SEVERAL LIABILITY.

The Boone Circuit Court granted a partial summary judgment against Cunningham, Gallion, and Mills and awarded what it referred to as the "baseline" damages. The trial court also determined that such damages were owed by CGM jointly and severally. Because it reversed the partial summary judgment, the Court of Appeals found it unnecessary to address the issue of joint and several liability. Having re-

versed the Court of Appeals and reinstated the partial summary judgment as to CGM's liability, we now address the question of joint and several liability.

■ CGM argue that the imposition of joint and several liability is barred in this case by KRS 411.182, which requires that in tort actions, fault must be apportioned among the individual parties at fault, and that damages must be allocated severally among the tortfeasors.[7] They argue that Appellants' claim for "breach of fiduciary duty" is a tort action that falls within the requirements of KRS 411.182. While we agree that KRS 411.182 applies only to tort actions, we do not agree with CGM's characterization of Appellants' claims as sounding exclusively in tort. We conclude that the trial court's designation of the damages as joint and several was proper for two reasons.

First, deconstructed to its basic components, as the trial court correctly recognized, Appellants' claim is essentially contractual, based upon CGM's breach of the attorney-client contracts. Appellants claim that Appellees were entitled to no more than the fee provided in their contracts with Appellants and that they took an amount far in excess of that, leaving Appellants with a correspondingly lesser recovery. KRS 411.182 does not apply to breach of contract cases. *See Ky. Farm Bureau Mut. Ins. Co. v. Ryan,* 177 S.W.3d 797, 800 (Ky.2005) ("[W]e conclude that

[KRS 411.182] expressly does not apply to contractual claims. . . .").

■ Second, by the manner in which they combined their efforts in the Fen-Phen litigation, CGM engaged in a joint enterprise, or joint adventure, for which joint and several liability is properly assessed pursuant to KRS 362.220. In *Roethke v. Sanger,* we restated the elements of a joint enterprise:

> Sometimes referred to as a joint adventure, a joint enterprise is "an informal association of two or more persons, partaking of the nature of a partnership, usually, but not always, limited to a single transaction in which the participants combine their money, efforts, skill, and knowledge for gain, with each sharing in the expenses and profits or losses." In *Huff v. Rosenberg,* Ky., 496 S.W.2d 352 (1973), we enumerated the elements essential to a joint enterprise, *viz:* "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." As to element number 3, it is necessary to the relationship that there be a sharing of the profits and losses; though in the absence of an express agreement,

---

7. KRS 411.182 provides:

(1) In all tort actions, including products liability actions, involving fault of more than one (1) party to the action, including third-party defendants and persons who have been released under subsection (4) of this section, the court, unless otherwise agreed by all parties, shall instruct the jury to answer interrogatories or, if there is no jury, shall make findings indicating:

(a) The amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and

(b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under subsection (4) of this section.

(2) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.

the sharing of losses may sometimes be implied from an express agreement to share profits.

68 S.W.3d 352, 364 (Ky.2001) (internal citations omitted).

■■■■ A joint enterprise is an informal partnership, existing for a limited purpose and duration. *See Jones v. Nickell,* 297 Ky. 81, 179 S.W.2d 195, 196 (1944) ("A joint adventure is a special or limited partnership or partnership for a special purpose. Ordinarily it is an association for a particular transaction, while a partnership contemplates a continuing business."). The liability that would attach under either a partnership theory or a joint enterprise is the same because both theories are unequivocally the same. *See id.* ("It is not material to determine whether the transaction in question constituted a partnership ... or a joint adventure, since in either event it is governed by the same principles of law."); *see also Manning v. Owens,* 277 Ky. 40, 125 S.W.2d 753, 756 (1939) (If a party is entitled to recover under the theory of a joint adventure, then the "case law relative to partnerships applies.").

Cunningham, Gallion, and Mills did not simply agree to collaborate for mutual support in their respective lawsuits against American Home. This was not the typical situation in which attorneys, each representing clients with similar claims against a common defendant, pooled their resources to enable them to more efficiently and economically represent their individual clients. CGM entered into a written agreement with each other for the common purpose of litigating the Fen–Phen claims of all of their clients. Each of them, by express written agreement with each other became "co-counsel" in the *Guard* case for *all* of the Appellants. They shared the common pecuniary purpose of the venture. They agreed on how they would share the work of the enterprise and how they would share its profits. Each maintained a voice in the managerial control of the enterprise. In effect, they formed an *ad hoc* partnership for a commercial purpose that precisely fits the definition of a joint enterprise, or joint adventure. Accordingly, their liability is governed by partnership principles. *Jones,* 179 S.W.2d at 196. *See also Whitsell v. Porter,* 309 Ky. 247, 217 S.W.2d 311, 313 (1949) ("So similar are they that the principles which govern the rights and the liabilities of members of a partnership apply and govern a joint adventure, and the responsibilities are tested by partnership rules.").

KRS 362.220 provides that "all partners shall be liable: (a) Jointly and severally for everything chargeable to the partnership under KRS 362.210 and 362.215[.]" KRS 362.210 provides that "[w]hen, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."

Under the particular facts of this case, for the reasons stated above, KRS 411.182 does not operate to prohibit joint and several liability against Cunningham, Gallion, and Mills. KRS 362.220 directs otherwise. The trial court properly awarded damages jointly and severally because the undisputed evidence establishes that Cunningham, Gallion, and Mills were engaged in a joint enterprise.

Appellants also contend that the joint and several liability of CGM should extend to Chesley because he acted in concert with CGM. We decline the invitation to do so. Chesley's liability has not been judicially determined. Chesley's role in the enterprise clearly differed from that of

Cunningham, Gallion, or Mills. The agreement itself seems to treat him differently. For example, the agreement provided that Chesley and Richard D. Lawrence would have "no responsibility for [the] timely filing ... of any complaints" and that CGM would "indemnify them from such responsibility." Whether the differences prove to be material is a matter that can only be determined as the case against him proceeds in the trial court.

## V. THE BOONE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DECLINED TO TRANSFER THE CASE TO THE FAYETTE CIRCUIT COURT.

▮ Appellants assert that the Court of Appeals erred by affirming the Boone Circuit Court's denial of their motion to transfer the case back to the Fayette Circuit Court. Appellants filed this case in the Fayette Circuit Court but, over their objection, the Fayette Circuit Court transferred the case to the Boone Circuit Court upon the theory that Boone County was the proper venue because the *Guard* case was adjudicated there. After nearly two years of litigation in the Boone Circuit Court, Appellants moved that court to transfer the case back to the Fayette Circuit Court. The Boone Circuit Court denied Appellants' motion, and eventually made that decision final and appealable in its order granting partial summary judgment.

▮ It is important to note that the venue decision challenged by Appellants, first in the Court of Appeals and now in this Court, was the Boone Circuit Court's refusal to transfer the case *back* to Fayette County for trial; they have not appealed the original order of the Fayette Circuit Court transferring the case *to* the Boone Circuit Court.[8] The venue issue confronted by the judge of the Boone Circuit Court was not the same issue addressed in the Fayette Circuit Court. The trial court judge at the receiving end of a venue transfer, if asked upon motion to reject the case and send it back to its original venue, addresses different factors than the trial court where the case was initially filed. The Fayette Circuit Court's decision that Boone County was the proper venue is of interest, but its correctness is not our concern at this point. To be clear, the issue now before this Court is *not* whether Boone County or Fayette County was the proper venue; the issue is whether the judge in the Boone Circuit Court erred by not transferring the case back to the Fayette Circuit Court where it was initially filed. We conclude that he did not.

Appellants argue that "venue was improper in Boone County and KRS 452.105 requires by its clear terms that the Boone

---

8. It is appropriate to point out again that this case is on appeal from partial summary judgments made final and appealable pursuant to CR 54.02. The interlocutory nature of the Fayette Circuit Court's order to transfer the case to the Boone Circuit Court prevented an immediate appeal. And we are aware that a writ of prohibition was not available because, as we have held, "one aggrieved by a venue determination may not obtain a writ of prohibition, but must proceed by appeal from a final judgment." *Fritsch v. Caudill*, 146 S.W.3d 926, 928 (Ky.2004) (quoting *Pettit v. Raikes*, 858 S.W.2d 171, 172 (Ky.1993)). *See* *also Fish v. Benton*, 138 Ky. 644, 128 S.W. 1067, 1068 (1910) ("The petitioner will have the right of appeal should the case go against him upon final trial in the circuit court of the county to which it is to be removed, which will afford him an adequate remedy, if it should result that the respondent committed an error in changing the venue of this case to Jessamine county."). Since we have seen no order making the Fayette order "final and appealable," it may be that until the ultimate adjudication of the case is completed in the trial court, the appeal of the Fayette order may not have ripened for appellate review.

County [Circuit] Court transfer the case to the court with proper venue." Appellants forcefully assert that all applicable venue statutes designate Fayette County as the proper venue, and that venue in Boone County was never proper. We shall assume, without so deciding, that Appellants are correct in that assertion. Nevertheless, it is clear that KRS 452.105 constrains *only* the court in which the action was initially filed, not the court to which the case was transferred.

KRS 452.105 states: "In civil actions, when the *judge of the court in which the case was filed* determines that the court lacks venue to try the case due to an improper venue, the judge, upon motion of a party, shall transfer the case to the court with the proper venue." (emphasis added). KRS 452.105 does not pertain to the Boone Circuit Court because this case was not filed in that court. However, KRS 452.090 *does* relate to the Boone Circuit Court and it provides that "[t]he court to which the action is removed shall have the same power as to its trial and final disposition as the court from which it was removed." Thus, even if the Fayette Circuit judge's transfer of the case to the Boone Circuit Court was erroneous, the Boone Circuit Court thereafter could properly adjudicate any unresolved aspects of the case. Thus, the issue is not whether Boone County was an improper venue. The issue is whether the Boone Circuit Court abused its discretion by retaining control of the case.

"Wide discretion is afforded to the trial court in determining a change of venue question." *Wood v. Commonwealth*, 178 S.W.3d 500, 513 (Ky.2005). "The trial court is vested with a sound discretion in determining the question where there is evidence both in support and in resistance of the motion, and this court has uniformly held that it will not interfere with the trial court's decision unless it appears with rea-sonable certainty that there has been an abuse of discretion." *Carnes v. Commonwealth*, 306 Ky. 55, 206 S.W.2d 44, 45 (1947).

Certainly, competent judges can disagree on questions of venue. For that reason, KRS 452.105 and KRS 452.090 work in tandem to avoid the problem that would arise if judges in different circuits or districts each believed venue was proper only in the other judge's court. Under Appellants' reading of KRS 452.105, if the Boone Circuit judge believed that the Fayette Circuit Court erred in transferring the case to Boone County, he would be required to send it back to Fayette. And the Fayette Circuit Court, having already decided that Boone was the proper forum, would have no choice but to bounce the case back again to Boone, which has already determined that the Fayette Circuit Court erred in the initial transfer, and so presumably again would bounce it back to Fayette. And so on it could go. But that does not happen because, as we construe it, KRS 452.105 applies only to the judge of the court "in which the case was filed." Therefore, even if the trial judge at the receiving end of a venue transfer believes the venue change was incorrect, he or she is not required to transfer the case back to the court of origin or to a third forum. Instead, pursuant to KRS 452.090, the "receiving" judge retains adjudicative responsibility over the case and may, upon motion, consider whether his retention of the case or another transfer of venue would more appropriately serve the interests of justice and judicial economy. It is with that understanding of the statutes that we examine the decision of the judge presiding over this case in the Boone Circuit Court.

Appellants argue that the Boone Circuit Court erred in retaining the case because there was no statutory basis for venue in

Boone County. To the contrary, KRS 452.090 provided the statutory basis for the Boone Circuit Court's authority over the case. That court had overseen the litigation for nearly two years when Appellants first presented the venue issue, and had addressed numerous issues essential to the litigation. The Boone Circuit Court judge was aware that the Fayette Circuit Court had, rightly or wrongly, already concluded that Boone County was the proper venue. Attempting to transfer the case back to Fayette County raised the possibility that the Fayette Court would reject it again. And, even if the Fayette Circuit Court retained the case, there would be additional delay and expense as a "new" judge assumed responsibility over the case, became familiar with the issues of the case, and, as might be reasonably expected, revisited some of the preliminary rulings of the Boone Circuit Court.

Given that situation, we cannot fault the Boone Circuit Court's decision denying the motion to transfer the case back to the Fayette Circuit Court. There was no abuse of discretion. Accordingly, we affirm the Court of Appeals.

## VI. THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT ON LITIGATION EXPENSES CLAIMED BY MILLS.

The attorney-client contracts upon which Appellants' claims are based include provisions for the attorneys to recover from the settlement or verdict the direct expenses incurred in the litigation. Because the Court of Appeals reversed the partial summary judgment in its entirety, it did not address the specific issue of the claimed expenses. As noted above, the trial court credited CGM with $1.5 million in expenses claimed by Mills. The provision for expenses in Mills's fee agreement provided, "Expenses, if any, will be paid up front by Attorney and repaid off the top before calculation of fee." Appellants contend that the trial court erred by allowing Appellees a credit against the "baseline" damages set out in the partial summary judgment for the $1.5 million dollars in litigation expenses that Mills claimed he incurred in the effort to secure the settlement of the *Guard* case. Appellants argue that deduction of the expenses from the baseline damage award was improper because the expenses included overhead costs, Mills never explained how the expenses related to the litigation, and the expenses were not substantiated by invoices or documentation.

The claimed expenses included what appears to be general overhead expenses such as staff salaries, office expenses, advertising, rent, utilities, supplies, and postage. The only "evidence" considered by the trial court was Mills's affidavit listing each expense without any explanation.

It is well-established that general overhead costs are not included in the calculation of expenses for contingency fee agreements. *See Kenseth v. C.I.R.*, 114 T.C. 399, 454–55 (2000), *aff'd*, 259 F.3d 881 (7th Cir.2001) ("One way to think of the contingent fee agreement ... is to analogize it to a cropsharing arrangement.... The attorney is in the position of the tenant farmer, who bears all his direct and overhead expenses incurred in earning the contingent fee.... The client is in the position of the landowner (lessee-sublessor), who bears none of the operating expenses, but is responsible for paying the carrying charges on his land, such as mortgage interest and real estate taxes. These charges are analogous to court costs, which the client under a contingent fee agreement is usually responsible for, and which the attorney can only advance to or on behalf of the client"). Generally, the expenses considered in contingency agree-

ments are court costs, investigation, medical examination, obtaining evidence, and the presentation of evidence. *See Kentucky Bar Ass'n v. Graves,* 556 S.W.2d 890, 891 (Ky.1977).

■ We agree with Appellants that the incorporation of these overhead expenses into the baseline damages calculated by the trial court was error. Mills's unsubstantiated list did not establish the validity of the claims with such certainty that it eliminated any genuine issue of fact. The credit claimed by Mills was not ripe for summary judgment and therefore we conclude that the expenses were improperly included in the partial summary judgment. Because questions of fact remain with respect to the validity of the claimed expenses, upon remand, they may be revisited by the trial court along with the other issues remaining for its further consideration.

## VII. CONCLUSION

For the foregoing reasons, the opinion of the Court of Appeals is affirmed in part and reversed in part. This action is hereby remanded to the Boone Circuit Court for further proceedings consistent with this Opinion.

MINTON, C.J., ABRAMSON, KELLER, NOBLE and SCOTT, JJ., concur. CUNNINGHAM, J., not sitting.