RENDERED: JANUARY 14, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0884-MR

NEW WORLD FLOORING, INC. AND
RICHARD BLINKHORN                                              APPELLANTS

                          APPEAL FROM CLINTON CIRCUIT COURT
v.                    HONORABLE DAVID L. WILLIAMS, JUDGE
                          ACTION NO. 12-CI-00076

STOCK YARDS BANK & TRUST
COMPANY                                                             APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: COMBS, DIXON, AND TAYLOR, JUDGES.

COMBS, JUDGE: This case involves a foreclosure proceeding. The Appellants,

Richard Blinkhorn and New World Flooring, Inc., appeal from the partial summary

judgment of the Clinton Circuit Court dismissing their counterclaim against Stock

Yards Bank & Trust Company (Stock Yards Bank or Stock Yards), the Appellee.

The circuit court determined that Stock Yards Bank was entitled to judgment as a

matter of law with respect to the allegation that it failed to perform -- in good faith -- its obligations under the terms of the parties' loan agreement. After our review, we affirm.

The following facts are undisputed. In 1991, Blinkhorn and his wife, Kim Blinkhorn, established Kentucky Timber Exports (KTE). In order to facilitate its operations, KTE obtained an inventory loan from Stock Yards Bank. Initially, the loan was guaranteed by the United States Small Business Administration (SBA).

Initially, KTE's business consisted primarily of exporting hardwood lumber and logs. It purchased rejected logs and rough-sawn lumber, which it sold to flooring companies across Europe. It also sawed lumber inventory that accumulated over time in its warehouse. Eventually, KTE also began selling "backing boards." In his deposition, Blinkhorn described "backing boards" as high-grade lumber that was essentially a by-product of veneer manufacture. The backing boards were used to produce flooring for installation directly onto concrete, mostly in Europe. In approximately 1999, Blinkhorn learned from a Portuguese flooring manufacturer that an engineered product was being manufactured in China at about one-half the price of the backing boards with which KTE was familiar.

In 2004, the SBA's guarantee of the line of credit extended to KTE expired. Stock Yards Bank converted the line of credit to a term loan secured by KTE's inventory and its accounts receivable. Additionally, the Blinkhorns executed personal guarantees to secure repayment of the loan.

The Blinkhorns then created Forest Brand Floors. This entity was established to solicit and distribute the Chinese manufactured flooring product in the U.S. market. Blinkhorn indicated that he sold Forest Brand Floors to a Dutch company in 2006 or 2007.

Meanwhile, KTE continued to hold a substantial inventory, including lumber and backing boards valued by Blinkhorn at as much as $300,000.00. Blinkhorn kept operating KTE by buying lumber and selling inventory. However, by March 2008, KTE was only able to make interest payments on its loan from Stock Yards Bank. As a result, it was ineligible to refinance the loan backed by an SBA guarantee.

Blinkhorn developed a business plan for a new entity: New World Flooring. Blinkhorn planned to locate raw materials within a trucking-day's radius of a south-central Kentucky plant and to manufacture a semi-finished flooring product to be sold to European and Chinese manufacturers. New World Flooring was incorporated in November 2007.

Blinkhorn began to seek out state and local government supported economic-development opportunities and to talk with Stock Yards Bank about potential SBA loan guarantees for the new business. In June 2008, Blinkhorn toured a former stave manufacturing facility in Clinton County. The facility was complete with dry kilns that seemed well suited to his plan for the new business. As the global economy was beginning to unravel, New World Flooring arranged to acquire the Clinton County facility and to renovate and upfit it for flooring production. He also intended to purchase tractor-trailers, equipment, and machinery from the company that had operated the stave mill. Ultimately, he would pay nothing for the land and existing buildings.

In late 2008, New World Flooring met with representatives of several lenders, including Stock Yards Bank. Blinkhorn believed that New World Flooring required three loans: the first for the upfitting and expansion of the manufacturing facility; a second for the purchase of equipment and machinery; and a third for working capital and for the purchase of logs and other inventory. In the first few months of 2009, New World Flooring also began securing investors. It submitted a loan application to Scott Parrott of Stock Yards Bank.

Eventually, Stock Yards Bank committed to make two loans to New World Flooring. The loan commitments were contingent upon two factors: (1) participation by the SBA and (2) access to an additional $100,000.00 either from a

line of credit from another bank or from investors. Stock Yards regarded these additional funds as essential to meet anticipated cash-flow demands that would arise in the months after the facility became operational.

In correspondence dated July 8, 2009, Stock Yards Bank confirmed to New World Flooring that it would loan the company the sum of $862,500.00 to be used in the operation and conversion of the existing stave mill to a sawmill for production of engineered hardwood flooring. The letter agreement was to be incorporated into the loan documents, and it provided that bank officers would be authorized at their discretion to make distributions to the borrower under the terms of any SBA loan guarantee limitations. Construction disbursements were to be made in accordance with the progress of the improvements. The loan was to be individually, jointly, and severally guaranteed by Blinkhorn and required a separate capital investment of $600,000.00 to be made to New World Flooring.

By another letter of the same date, Parrott confirmed that Stock Yards Bank would loan to New World Flooring an additional sum of $637,500.00 for the conversion of the stave mill to a sawmill and operation costs. Again, the loan was to be guaranteed by Blinkhorn and the SBA. Stock Yards Bank specifically declined to extend to New World Flooring the third loan proposed by Blinkhorn for further working capital or inventory financing.

On August 14, 2009, Blinkhorn submitted an SBA loan-guarantee application on behalf of New World Flooring to Stock Yards Bank. In the application, Blinkhorn indicated that New World Flooring would use $157,010.00 of the anticipated loan proceeds to purchase inventory.

On August 28, 2009, Parrott submitted to the SBA both Blinkhorn's information concerning his financial projections for New World Flooring and the bank's own credit analysis. Stock Yards Bank indicated that a portion of the loan proceeds guaranteed by the SBA ($157,010.00) would be used to purchase inventory from KTE, an affiliated company, and that KTE would use those proceeds to repay a loan to Stock Yards Bank.

In correspondence dated September 3, 2009, the SBA declined to extend its guarantee under this condition. It indicated to Parrott that no part of the loan proceeds could be used to repay KTE's debt. It advised that loan proceeds "may not be used for payments, distributions or loans to an Associate of the applicant except for compensation for services actually rendered at a fair and reasonable rate." It stated that the "use of proceeds to purchase inventory is to indirectly use to refinance a debt of the affiliate company."

Through email correspondence, Parrott specifically discussed with Blinkhorn the SBA's concern about New World Flooring's purchase of KTE inventory. Parrott's email to Blinkhorn indicated that Blinkhorn should provide to

the bank documentation indicating that the planned purchase of KTE inventory was an arms-length transaction between KTE and New World Flooring. Blinkhorn responded by email. An inventory report prepared for KTE was attached and indicated that KTE held 250 backing boards worth $190,606.71 that would be sold to New World Flooring at a deep discount. Blinkhorn represented that KTE would not continue to amass and hold inventory but would continue to operate only as a broker once KTE's current inventory was sold.

On September 11, 2009, Stock Yards Bank responded to the SBA's concerns about New World Flooring's anticipated purchase of KTE inventory with an updated credit memorandum. Parrott indicated that the loan proceeds would be used "to purchase equipment, construct a pre-engineered building, make renovations to the existing mill and purchase inventory." He noted again that "approximately $157,010.00 of loan proceeds in facility number one [the loan of $862,500.00] will be used to purchase inventory from Kentucky Timber Exports, Inc." Stock Yards Bank represented that the inventory was valued at $190,607.00, "making the purchase price fair and reasonable." Stock Yards Bank explained that "[t]his sales price for needed inventory is $33,597 below market value" and that the bank would not take a lien on the inventory so that New World Flooring would be better able to apply for a working capital line of credit with another lender in the future.

The sources and uses of funds statement submitted by the bank to the SBA indicated that New World Flooring would have $600,000.00 in cash and $1,500,000.00 in bank loans. New World Flooring was to use the funds to acquire fixed assets (renovations, equipment, and machinery) totaling $1,342,990.00 and inventory totaling $157,010.00.

As part of a federal stimulus package enacted by Congress in 2009, an SBA-funded, 90% government guarantee of the loans extended to New World Flooring was authorized on September 16, 2009. Additionally, the SBA paid a guarantee fee worth tens of thousands of dollars on behalf of New World Flooring. The SBA's loan guarantee specifically provided that $157,010.00 of the bank's loan proceeds would be used to purchase inventory. Stock Yards bank expressly agreed that it would "document that Borrower used the loan proceeds for the purposes stated in this Authorization." The bank was charged with documenting all disbursements. A copy of the authorization was forwarded to Blinkhorn and to New World Flooring for review. Blinkhorn asked no questions and raised no objections to the terms of the authorization.

On November 5, 2009, Blinkhorn communicated with Paul Conway, the attorney in charge of closing the loans. Blinkhorn requested copies of the loan documents for his review. Conway forwarded a draft of the documents to Blinkhorn and provided a list of documents that he (Conway) required to complete

his preparation for the closing. Conway requested that Blinkhorn provide "a bill of sale for inventory New World Flooring is purchasing from the hardwood company [KTE]." Blinkhorn responded that New World Flooring's attorney would look over the list of documents needed for closing.

On November 6, 2009, Blinkhorn emailed Conway. He included an invoice to New World Flooring for the KTE inventory and deposit instructions. KTE's invoice to New World Flooring describes the inventory being sold as "backing board and lumber inventory" with payment to be deposited into KTE's Stock Yards Bank account. The invoice was for $175,000.00.

On November 10, 2009, New World Flooring executed promissory notes in favor of Stock Yards Bank. The parties' loan agreement described two loans: one for $637,500.00, the other for $862,500.00. The loan of $862,500.00 was to be used to purchase equipment, machinery, tools, loaders, tractor-trailers, and other vehicles associated with the stave mill facility and to "purchase inventory and to make certain real improvements and renovations to the same." The SBA executed unconditional guarantees of both notes. Stock Yards took a mortgage against the Clinton County real property, and the Blinkhorns executed their own personal guarantees. Some loan proceeds were distributed right away. Pursuant to the terms of the parties' agreement, New World Flooring had to complete its draws against the balance of the loan proceeds within six months. No

one objected to the use of the loan proceeds as required by the terms of the parties' agreement.

Over the course of the next few months, New World Flooring purchased more equipment and continued to prepare the facility for operation of the sawmill. In his deposition, Blinkhorn explained that before it could kiln dry lumber at the facility, New World Flooring expected to set up veneer saws and begin to produce "rifted and quartered lumber" from inventory it purchased from KTE to meet anticipated customer demand. He stated that he and Parrott were aware that the need for additional financing would arise after six months. He also noted that they expected that once the SBA-guaranteed loans were made, New World Flooring could secure a loan from another bank. Stock Yards Bank anticipated that New World Flooring's inventory would have to be pledged as collateral to secure another loan. Blinkhorn continued to pursue "the third leg of the stool" -- the loan that he projected would be necessary for additional operating capital requirements and the purchase of logs and other inventory for production.

On November 18, 2009, Scott Parrott corresponded with Blinkhorn by email regarding the bank's loan to KTE. He requested late payments totaling $6,661.96 for the months of October and November.

Blinkhorn responded by email. He admitted that he was "a little confused" and indicated that he was under the impression that "we can draw from

the inventory portion [of the New World Flooring loan] with an invoice." He proposed "an invoice of $25,000 purchase against the $157,000 now until we get the machines in and running." Blinkhorn forwarded KTE's invoice to Parrott. Blinkhorn testified in his deposition that KTE's inventory was kiln-dried and could be used right away for production once the veneer saws were in place. He indicated that New World Flooring could work through a $10,000.00 purchase of KTE's inventory within four to six weeks.

Parrott confirmed the $25,000.00 invoice from KTE to New World Flooring. In response, he disbursed $25,000.00 from the loan proceeds to New World Flooring; debited the account of New World Flooring in the amount of $25,000.00 to pay the invoice; and deposited that amount into KTE's account. KTE's account was debited for $25,000.00, and that amount applied to its outstanding indebtedness.

On January 3, 2010, KTE sent a second invoice to New World Flooring in the amount of $25,000.00 for backing boards. The invoice was faxed to Stock Yards Bank under a cover indicating that it concerned "Inventory."

On January 7, 2010, $25,000.00 was disbursed by the bank to New World Flooring; debited from the account of New World Flooring; and deposited into KTE's account. KTE's account was debited for $25,000.00 and that amount applied to its outstanding indebtedness.

On March 29, 2010, KTE sent a third invoice to New World Flooring in the amount of $25,000.00 for backing boards. The invoice was faxed to Stock Yards Bank under a cover indicating again that it related to "Loan Draw -- Inventory." New World Flooring specifically requested that the bank advise "once this has been processed."

On March 30, 2010, $25,000.00 was disbursed by the bank to New World Flooring; debited from the account of New World Flooring; and deposited into KTE's account. KTE's account was debited for $25,000.00 and that amount applied to its outstanding indebtedness.

On May 5, 2010, KTE sent another invoice to New World Flooring in the amount of $82,010.00 for backing boards. The invoice was faxed to Stock Yards Bank, and again that sum was disbursed by the bank to New World Flooring. The invoice was paid, and KTE's account was debited to pay the remaining balance of its loan from Stock Yards Bank. According to Blinkhorn, New World Flooring continued to purchase KTE inventory on credit. New World Flooring only turned a profit in July and August of 2010.

In the fall of 2010, Paducah Bank loaned New World Flooring an additional $400,000.00. As anticipated, New World Flooring was required to pledge the inventory that it had acquired from KTE as collateral to secure the loan.

By June 2011, New World Flooring was running out of cash and was failing to meet its obligations to repay its loans. After New World Flooring defaulted under the terms of the $862,500.00 promissory note, Stock Yards Bank accelerated the debt. New World Flooring ceased operations in November 2011.

In May 2012, Stock Yards Bank filed a lawsuit against New World Flooring, Blinkhorn, and others alleging breach of the parties' loan agreement. It sought enforcement of the personal guarantees and foreclosure of the mortgage encumbering the real property securing the debt.

New World Flooring and Blinkhorn answered and filed a counterclaim against Stock Yards Bank. They alleged first that the bank had breached the implied covenant of good faith and fair dealing by encouraging Blinkhorn "to draw money off the loan . . . to pay debt associated with the loan to [Kentucky Timber Exports]." Second, they asserted a tort-based, bad-faith claim. New World Flooring and Blinkhorn contended that the bank's misconduct left the business with insufficient working capital -- leading to its collapse. Stock Yards Bank answered and denied any wrongdoing. A period of discovery began.

By agreement of the parties, much of the pledged collateral was liquidated, and the proceeds were applied to the debt of New World Flooring. A deficiency balance remained, however, and in January 2014, Stock Yards Bank filed a motion for summary judgment against Blinkhorn and New World Flooring.

Stock Yards argued that it was entitled to judgment as a matter of law because there was neither a dispute concerning the terms of the note and guarantee nor the amount of the remaining balance of the debt. It argued that the counterclaim was unsupportable both in fact and in law.

New World Flooring and Blinkhorn responded to the motion in March 2014. They argued that summary judgment was inappropriate because genuine issues of material fact existed regarding the bank's breach of the covenant of good faith and fair dealing and their bad-faith claim. Blinkhorn contended that he first learned of the plan to disburse $157,010.00 solely for the purchase of KTE inventory only *after* the closing; that KTE's inventory did not meet New World Flooring's specific requirements; and that the bank wanted invoices from KTE for inventory shipped to New World Flooring to be forwarded intermittently "presumably to avoid detection by SBA." New World Flooring contended that if it had it been able to use $157,010.00 to purchase **new** logs instead of using KTE's inventory, it could have filled a large order placed by a Chinese company at a profit. It argued that Stock Yards Bank unilaterally modified the parties' loan agreement to suit the bank's own best interests.

Stock Yards Bank replied, arguing that the material facts were plain and undisputed. Stock Yards argued that SBA documentation proved that from the initial loan application, there was an intention to disburse $157,010.00 of the loan

proceeds solely for the purpose of acquiring KTE's inventory and that KTE, in turn, would use those funds to repay its loan to Stock Yards Bank. It indicated that Blinkhorn himself had provided information necessary to show the SBA that this purchase of inventory was an arms-length transaction between the associated businesses. Finally, Stock Yards referred to Blinkhorn's representation at closing that he had reviewed the terms of the SBA's guarantee authorization specifically -- including as a requirement the use of $157,010.00 in loan proceeds in short order to purchase inventory. Stock Yards Bank explained that the disputed loan proceeds had been disbursed pursuant to invoices and draw requests submitted by New World Flooring and that they had been used exactly as required by the terms of the SBA guarantee and the parties' loan agreement. Finally, it argued that the damages claimed by New World Flooring were unreasonably speculative. Stock Yards concluded that any claims that it had breached its duty of good faith and fair dealing -- or that it had otherwise acted in bad faith -- must fail as a matter of law.

On April 3, 2014, the circuit court conducted a hearing on the motion. Stock Yards filed supplemental material as requested by the court, and New World Flooring filed a supplemental response. The circuit court's final and appealable order granting partial summary judgment was entered on October 10, 2019. This appeal followed.

Summary judgment is appropriate where no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. CR[1] 56. In response to a motion for summary judgment, the respondent must present at least some affirmative evidence showing the existence of a genuine issue of material fact. *City of Florence v. Chipman*, 38 S.W.3d 387 (Ky. 2001).

Blinkhorn and New World Flooring contend that the circuit court erred by dismissing their counterclaims. They argue that Stock Yards breached the covenant of good faith and fair dealing implied by the terms of the parties' loan agreement as well as its common law duty to act in good faith by refusing to disburse the inventory loan proceeds to New World Flooring -- and instead using those proceeds to repay KTE's loan. We address these claims individually.

With respect to their contract claim, Blinkhorn and New World Flooring contend that Stock Yards engaged in conduct that deprived New World Flooring of the benefit of its bargain. They argue that Stock Yards's duty of good faith and fair dealing prevented the bank from deciding to disburse loan proceeds earmarked for "inventory" exclusively to pay KTE invoices. They claim that Stock Yards was bound to disburse loan proceeds sufficient to allow New World Flooring to purchase **whatever inventory** it needed to succeed. We disagree.

---

[1] Kentucky Rules of Civil Procedure.

Within every contract, there is an implied covenant of good faith and fair dealing. *Ranier v. Mount Sterling Nat'l. Bank*, 812 S.W.2d 154 (Ky. 1991). That implied covenant imposes upon the parties a duty to do everything necessary to carry out the contract. *Harvest Homebuilders LLC v. Commonwealth Bank and Trust Co.*, 310 S.W.3d 218 (Ky. App. 2010). However, the implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights. *De Jong v. Leitchfield Deposit Bank*, 254 S.W.3d 817 (Ky. App. 2007).

The record does not demonstrate that Stock Yards Bank failed to perform -- in good faith -- any duty or obligation under the parties' agreement. Instead, the record shows that the bank was required to account strictly for the disbursements and that it fulfilled its obligations under the express terms of the loan agreement.

In his affidavit, Blinkhorn reported that he first learned that a portion of the loan proceeds were earmarked for the purchase of KTE's inventory only after the closing "[when] all of the investors' money and a significant portion of the loan proceeds had already been dispersed [*sic*]." However, documentary evidence directly refutes this representation.

The parties' letter agreement incorporated into the loan documents expressly provided that bank officers would be authorized **at their discretion** to make distributions to the borrower under the terms of the SBA loan guarantee

limitations.  In the SBA loan application, Blinkhorn indicated that New World Flooring would use $157,010.00 of the loan proceeds to purchase inventory.  Prior to closing, Blinkhorn provided an invoice to New World Flooring for the KTE "backing board and lumber inventory" and provided instructions to deposit a portion of the loan proceeds into KTE's account with Stock Yards Bank.  This invoice exceeded the entirety of the loan proceeds restricted to the purchase of inventory.

Thereafter, Blinkhorn submitted to the bank another four invoices for inventory supplied to New World Flooring by KTE (totaling $257,010.00) and requested a timely draw on the loan proceeds to pay each one.  Having performed according to the express terms of the parties' agreement and distributed the loan proceeds pursuant to the specific requests of New World Flooring, it cannot be said that Stock Yards Bank took any improper action with respect to New World Flooring.  A party's subjective beliefs about the nature of the evidence is not the affirmative proof required to avoid summary judgment.  *See Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1 (Ky. 1990).  We are persuaded that Stock Yards Bank did not breach the implied covenant of good faith and fair dealing.  The bank showed that it was entitled to judgment as a matter of law with respect to the contract claim.

With respect to their tort claim, Blinkhorn and New World Flooring contend that Stock Yards Bank violated its fiduciary relationship with New World Flooring by forcing the company to purchase KTE's inventory. They contend that the bank utilized confidential information about the business's plans to profit at the expense of New World Flooring. We disagree.

Before determining whether the bank breached a fiduciary duty to New World Flooring, we must first examine whether a special relationship existed between lender and borrower sufficient to create the obligations of a fiduciary. A fiduciary is one who has expressly undertaken to act for the primary benefit of another. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991). A fiduciary duty is "the highest order of duty imposed by law." *Abbott v. Chesley*, 413 S.W.3d 589, 600 (Ky. 2013) (citation omitted).

Fiduciary relationships arise where the circumstances and the relationship between the parties show that each understands that one party will be acting in the interest of the other. *In re Sallee*, 286 F.3d 878 (6th Cir. 2002).

> Although fiduciary relationships can be informal, a fiduciary duty does not arise from the universal business duty to deal fairly nor is it created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary.

*Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 552 (Ky. 2009).

In a similar vein, we note the following language: "Whether a fiduciary duty exists by virtue of the relationship between various actors is generally a question of law for the courts to decide as it essentially involves a policy determination." *Scott v. Forcht Bank, N.A.*, 521 S.W.3d 591, 597 (Ky. App. 2017) (citing *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 248 (Ky. 1992)).

Ordinarily, a bank does not have a fiduciary relationship with its borrower. *In re Sallee*, *supra* (discussing Kentucky fiduciary law). Only when a bank profits at the specific expense of its borrower has such a duty ever been imposed. *Seeger Enterprises, Inc. v. Town & Country Bank and Trust Co.*, 518 S.W.3d 791 (Ky. App. 2017).

In *Steelvest*, 807 S.W.2d 476, a fiduciary duty was imposed upon a bank with respect to its borrower where the bank used the confidential business plans of one borrower to help the borrower's competitor generate new business for the bank -- all to the specific detriment of the original borrower. In *Henkin, Inc. v. Berea Bank & Trust Company*, 566 S.W.2d 420 (Ky. App. 1978), a fiduciary duty was imposed where the bank's borrower revealed, in confidence, the nature of a corporate opportunity -- and the bank then took advantage of the opportunity for its own benefit and to the borrower's specific detriment. These circumstances differ vastly from those described by Blinkhorn.

-20-

In his affidavit, Blinkhorn explained that the bank should have understood from its interactions with New World Flooring that "90% to 95% of New Worlds [*sic*] business would be for plain sawn lumber" -- not KTE's backing boards. He claimed that KTE's inventory was being shipped to New World Flooring's facility not for production but only to avoid "paying storage at two facilities." He contended that presented with copies of business plans and financial projections, Stock Yards "should have known that the company would need operating capital for the acquisition of log inventory." Finally, Blinkhorn and New World Flooring argue that the bank's failure to make loan proceeds available for the purchase of log inventory caused the company to lose a vital contract and ultimately to fail. In light of the undisputed facts, we conclude, as a matter of law, that these circumstances are insufficient to create a fiduciary relationship between the parties.

From the negotiations surrounding this transaction and the conditions placed upon the loan, it is clear that the parties were always dealing at arms' length. Each party was aware that it was expected to protect its own interest. Despite Blinkhorn's post-litigation contentions, both Stock Yards and New World Flooring benefitted from New World Flooring's purchase of KTE's discounted inventory. Stock Yards Bank did not conceal its interest in the transaction or fail to disclose this specific requirement.

Additionally, in an effort better to protect its security, Stock Yards: required New World Flooring to secure a cash infusion from investors; aided the company to qualify for a loan from another bank for the purchase of additional inventory and working capital; and worked diligently to organize the SBA's guarantee of the loan. Stock Yards Bank undertook these measures earnestly and openly -- not as an insurer of New World Flooring's success, *but to promote its own interest*. Blinkhorn, in turn, resisted some of Stock Yards's terms and negotiated more favorable ones for the advantage of New World Flooring.

It is unreasonable under these circumstances to conclude that the bank knew (or should have known) more about the needs of the business, market demands, or competitors than Blinkhorn, an experienced lumber industry participant, divulged or professed to know. Under the circumstances, the bank did not have a duty to advise the company concerning the shrewdness or folly of Binkhorn's business decisions. Nor did it have a duty to protect New World Flooring from: market changes; the chance that other lenders would ultimately be reluctant to extend funding for the company's additional capital requirements; or the anticipated seasonal availability of logs.

From the facts as established by the record, New World Flooring and Blinkhorn clearly understood that Stock Yards did not intend to put the company's interest ahead of its own. They have not shown that Stock Yards profited from any

confidence it gained from New World Flooring to the company's detriment. Finally, there is no credible evidence of record to indicate that Stock Yards Bank misrepresented or failed to disclose any material fact concerning the terms of its loan. New World Flooring's relationship with Stock Yards Bank was simply a typical debtor-creditor relationship. "In an arms-length commercial transaction, where each party is assumed to be protecting its own interest, no [fiduciary] duty arises." *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 4 (Ky. App. 2012) (citing *In re Sallee*, 286 F.3d at 894). Consequently, the bad-faith claim asserted by Blinkhorn and New World Flooring fails as a matter of law. The circuit court did not err by awarding partial summary judgment with respect to the tort-based claim.

Therefore, we affirm the partial summary judgment of the Clinton Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Scott A. Bachert
Bowling Green, Kentucky

BRIEF FOR APPELLEE:

H. Kevin Eddins
Gregory L. Taylor
Louisville, Kentucky